# FORT WAYNE BOOKS, INC. *v.* INDIANA ET AL.

No. 87–470.   Argued October 3, 1988—Decided February 21, 1989*

---

*Together with No. 87–614, *Sappenfield et al.* v. *Indiana,* on certiorari to the Court of Appeals of Indiana.

WHITE, J., delivered the opinion of the Court, in Part I of which REHN-QUIST, C. J., and BRENNAN, BLACKMUN, STEVENS, O'CONNOR, SCALIA, and KENNEDY, JJ., joined, in Part II-A of which REHNQUIST, C. J., and BRENNAN, STEVENS, SCALIA, and KENNEDY, JJ., joined, in Parts II-B and II-C of which REHNQUIST, C. J., and BLACKMUN, SCALIA, and KENNEDY, JJ., joined, and in Part III of which REHNQUIST, C. J., and BRENNAN, BLACKMUN, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. BLACKMUN, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 68. O'CONNOR, J., filed an opinion concurring in part and dissenting in part, *post*, p. 68. STEVENS, J., filed an opinion dissenting in No. 87–614 and concurring in part and dissenting in part in No. 87–470, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 70.

*John H. Weston* argued the cause for petitioners in both cases. With him on the briefs for petitioner Fort Wayne Books, Inc., were *David M. Brown, G. Randall Garrou,* and *Lee J. Klein. Richard Kammen* filed briefs for petitioners Sappenfield et al.

*Stephen Goldsmith, pro se,* argued the cause for respondents in both cases and filed a brief for himself in No. 87–470. *Linley E. Pearson,* Attorney General of Indiana, and *William E. Daily,* Deputy Attorney General, filed a brief for respondents State of Indiana et al.†

---

†Briefs of *amici curiae* urging reversal were filed for the American Booksellers Association, Inc., et al. by *Michael A. Bamberger* and *Jonathan B. Piper;* for the American Civil Liberties Union et al. by *Marvin*

JUSTICE WHITE delivered the opinion of the Court.‡

We have before us two decisions of the Indiana courts, involving the application of that State's Racketeer Influenced and Corrupt Organizations (RICO) and Civil Remedies for Racketeering Activity (CRRA) Acts to cases involving bookstores containing allegedly obscene materials.

## I

The two causes before us arise from wholly unrelated incidents.

### A

Petitioner in No. 87–470, Fort Wayne Books, Inc., and two other corporations[1] each operated an "adult bookstore" in Fort Wayne, Indiana. On March 19, 1984, the State of Indiana and a local prosecutor, respondents here, filed a civil action against the three corporations and certain of their em-

_____

*E. Frankel, Jeffrey S. Trachtman, John A. Powell, Steven R. Shapiro,* and *Richard A. Waples;* for PHE, Inc., by *Bruce J. Ennis, Jr.,* and *David W. Ogden;* and for the Video Software Dealers Association by *Charles B. Ruttenberg* and *Theodore D. Frank.*

Briefs of *amici curiae* urging affirmance were filed for the United States by *Solicitor General Fried, Acting Assistant Attorney General Dennis, Deputy Solicitor General Bryson,* and *Michael K. Kellogg;* for Robert K. Corbin, Attorney General of Arizona, by *Mr. Corbin, pro se,* and *Bruce A. Taylor;* for Tom Collins, County Attorney of the County of Maricopa, Arizona, by *Benjamin W. Bull;* for Morality in Media, Inc., by *John J. Walsh* and *Paul J. McGeady;* and for James J. Clancy et al. by *Mr. Clancy, pro se.*

Briefs of *amici curiae* were filed for Spartacist League et al. by *Rachel H. Wolkenstein;* and for the National District Attorneys' Association by *G. Robert Blakey.*

‡JUSTICE BRENNAN joins only Parts I, II–A, and III of this opinion, and JUSTICE STEVENS joins only Parts I and II–A.

[1] In addition to petitioner Fort Wayne Books, Inc., the Fort Wayne proceedings involved Cinema Blue of Fort Wayne, Inc., and Erotica House Bookstore, Inc. See App. 7.

These other entities did not seek certiorari or enter an appearance in this Court. We therefore deal only with the claims and issues raised by Fort Wayne Books, Inc.

ployees alleging that defendants had engaged in a pattern of racketeering activity by repeatedly violating the state laws barring the distribution of obscene books and films, thereby violating the State's RICO law.[2] The complaint recited 39 criminal convictions for selling obscene publications from the three stores. App. 9–37. It was also alleged that there were currently other obscene materials available for sale in the stores. *Id.*, at 37–44. The proceeds from the sales of obscene materials, it was alleged, were being used to operate and maintain the bookstores. Respondents sought civil injunctive relief to bar further racketeering violations, invoking the State's CRRA statute, Ind. Code § 34–4–30.5–1 *et seq.* (1988). Among the remedies requested in the complaint was forfeiture of all of Fort Wayne Books' property, real and personal, that "was used in the course of, intended for use in the course of, derived from, or realized through" petitioner's "racketeering activity." App. 47. Such forfeiture is authorized by the CRRA statute. Ind. Code § 34–4–30.5–3(a) (1988).

Respondents also moved, in a separate "Verified Petition for Seizure of Property Subject to Forfeiture," for the particular judicial order that is the subject of our consideration here. Specifically, respondents asked the Allen County Circuit Court "to immediately seize . . . all property 'subject to forfeiture' as set forth in [the CRRA] complaint." App. 51. Such pretrial seizures are authorized under Ind. Code § 34–4–30.5–3(b) (1988), which empowers prosecutors bringing CRRA actions to move for immediate seizure of the property subject to forfeiture, and permits courts to issue seizure orders "upon a showing of probable cause to believe that a violation of [the State's RICO law] involving the property in question has occurred." The seizure petition was supported

---

[2] A 1984 amendment to the state RICO law had added obscenity violations to the list of predicate offenses deemed to constitute "racketeering activity" under Indiana law. See Ind. Code § 35–45–6–1 (1988).

by an affidavit executed by a local police officer, recounting the 39 criminal convictions involving the defendants, further describing various other books and films available for sale at petitioner's bookstores and believed by affiant to be obscene, and alleging a conspiracy among several of petitioner's employees and officers who had previous convictions for obscenity offenses. App. 55–78.

The trial court, *ex parte*, heard testimony in support of the petition and had supporting exhibits before it. On the same day, the court entered an order finding that probable cause existed to conclude that Fort Wayne Books was violating the State RICO law, and directing the immediate seizure of the real estate, publications, and other personal property comprising each of the three bookstores operated by the corporate defendants. *Id.*, at 81–83. The court's order authorized the county sheriff to padlock the stores. This was done, and a few days later, the contents of the stores were hauled away by law enforcement officials. No trial date on the CRRA complaint was ever set.

Following the March 1984 seizure of the bookstores, Fort Wayne Books sought to vacate the *ex parte* seizure order. An adversarial hearing on a motion to vacate the order based on federal constitutional grounds failed to yield relief. Other efforts to obtain some measure of relief also failed. The trial court did, however, certify the constitutional issues to the Indiana Court of Appeals. In June 1985, that court held that the relevant RICO/CRRA provisions were violative of the United States Constitution. *4447 Corp.* v. *Goldsmith*, 479 N. E. 2d 578 (Ind. App.).[3] The Indiana Supreme Court re-

---

[3] The Indiana Court of Appeals had consolidated the *Fort Wayne Books* case with another case arising from a CRRA action brought in Indianapolis, *4447 Corp.* v. *Goldsmith*. The Indiana Supreme Court also heard these cases on a consolidated basis, issuing a single judgment upholding both seizures.

Only Fort Wayne Books, Inc., petitioned for review of the decision below. See Pet. for Cert. in No. 87–470, p. iv. Officials of the 4447 Corporation have never expressed any interest in the proceedings here, and

versed, upholding the constitutionality of the CRRA statute as a general proposition and the pretrial seizure of Fort Wayne Books' store as a specific matter. *4447 Corp.* v. *Goldsmith*, 504 N. E. 2d 559 (1987).

We granted Fort Wayne's petition for certiorari, 485 U. S. 933 (1988), for the purpose of considering the substantial constitutional issues raised by the pretrial seizure.

### B

In No. 87–614, an investigation of adult bookstores in Howard County, Indiana, led prosecutors there, in April 1985, to charge petitioner Sappenfield with six counts of distribution of obscene matter, in violation of Ind. Code § 35–49–3–1 (1988). In addition, employing the 1984 amendments to the Indiana RICO statute discussed above, prosecutors used these alleged predicate acts of obscenity as a basis for filing two charges of RICO violations against petitioner. App. 142–143, 148–149. The obscenity charges were Class A misdemeanors under Indiana law, the racketeering offenses Class C felonies.

The trial court dismissed the two RICO counts on the ground that the RICO statute was unconstitutionally vague as applied to obscenity predicate offenses. The Indiana Court of Appeals reversed and reinstated the charges against petitioner. Relying on the Indiana Supreme Court's opinion under review here in No. 87–470, *4447 Corp.* v. *Goldsmith*, *supra*, the Court of Appeals held that "Indiana's RICO statute is not unconstitutional as applied to the State's obscenity statute." 505 N. E. 2d 504, 506 (1987). The Indiana Supreme Court declined to review this holding of the Indiana Court of Appeals.

---

several factual aspects of that case brought to our attention during Argument, see Tr. of Oral Arg. 53, suggest that it may be moot. In any event, we address only the claims and issues presented by Fort Wayne Books, Inc.

We granted certiorari, 485 U. S. 933 (1988), and consolidated this case with No. 87–470, to consider the common and separate issues presented by both cases.

## II

Since it involves challenges to the constitutionality of the Indiana RICO statute, we deal first with No. 87–614.

As noted above, petitioner was charged with six substantive obscenity violations and two RICO offenses. App. 138–149. Petitioner challenged only the latter charges, raising no objection to the obscenity indictments. *Id.*, at 150. He makes no claim here that the Constitution bars a criminal prosecution for distributing obscene materials.[4] Rather, petitioner's claim is that certain particulars of the Indiana RICO law render the prosecution of petitioner under *that* statute unconstitutional. Petitioner advances several specific attacks on the RICO statute.

## A

Before we address the merits of petitioner's claims, we must first consider our jurisdiction to hear this case. The relevant statute, 28 U. S. C. § 1257, limits our review to "[f]inal judgments or decrees" of the state courts. The general rule is that finality in the context of a criminal prosecution is defined by a judgment of conviction and the imposition of a sentence. See *Parr* v. *United States*, 351 U. S. 513, 518 (1956); *Berman* v. *United States*, 302 U. S. 211, 212 (1937). Since neither is present here, we would usually conclude that the judgment below is not final and is hence unreviewable.

There are, however, exceptions to the general rule. See *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469 (1975). *Cox*

---

[4] The constitutionality of criminal sanctions against those who distribute obscene materials is well established by our prior cases. See, *e. g.*, *Pinkus* v. *United States*, 436 U. S. 293, 303–304 (1978); *Splawn* v. *California*, 431 U. S. 595, 597–599 (1977); *Miller* v. *California*, 413 U. S. 15, 23–26 (1973); *Kingsley Books, Inc.* v. *Brown*, 354 U. S. 436, 441 (1957).

identified four categories of cases in which a judgment is final even though further proceedings are pending in the state courts. This case fits within the fourth category of cases described in *Cox:*

"[W]here the federal issue has been finally decided in the state courts with further proceedings pending in which the party seeking review here might prevail on the merits on nonfederal grounds, thus rendering unnecessary review of the federal issue by this Court, and where reversal of the state court on the federal issue would be preclusive of any further litigation on the relevant cause of action . . . in the state court proceedings still to come. In these circumstances, if a refusal immediately to review the state-court decision might seriously erode federal policy, the Court has entertained and decided the federal issue, which itself has been finally determined by the state courts for the purposes of the state litigation." *Id.*, at 482–483.

This case clearly satisfies the first sentence of the above-cited passage: petitioner could well prevail on nonfederal grounds at a subsequent trial, and reversal of the Indiana Court of Appeals' holding would bar further prosecution on the RICO counts at issue here. Thus, the only debatable question is whether a refusal to grant immediate review of petitioner's claims "might seriously erode federal policy." *Ibid.*

Adjudicating the proper scope of First Amendment protections has often been recognized by this Court as a "federal policy" that merits application of an exception to the general finality rule. See, *e. g.*, *National Socialist Party of America* v. *Skokie*, 432 U. S. 43, 44 (1977) *(per curiam); Miami Herald Publishing Co.* v. *Tornillo*, 418 U. S. 241, 246–247 (1974). Petitioner's challenge to the constitutionality of the use of RICO statutes to criminalize patterns of obscenity offenses calls into question the legitimacy of the law enforcement practices of several States, as well as the Federal Gov-

ernment.[5]    Resolution of this important issue of the possible limits the First Amendment places on state and federal efforts to control organized crime should not remain in doubt. "Whichever way we were to decide on the merits, it would be intolerable to leave unanswered, under these circumstances, an important question of freedom of the press under the First Amendment; an uneasy and unsettled constitutional posture [of the state statute in question] could only further harm the operation of a free press." *Tornillo, supra, at* 247, n. 6.

JUSTICE O'CONNOR contends that a contrary result is counseled here by our decision in *Flynt* v. *Ohio*, 451 U. S. 619 (1981) *(per curiam)*.    *Post*, at 69–70.    But as the Court understood it, "[t]he question presented for review [in *Flynt* was] whether on [that] record the decision to prosecute petitioners was selective or discriminatory *in violation of the Equal Protection Clause.*"    *Flynt, supra*, at 622 (emphasis added).    The claim before us in *Flynt* was not a First Amendment claim, but rather an equal protection claim (albeit one in the context of a trial raising First Amendment issues).    As a result, *Cox's* fourth exception was held to be inapplicable in that case.    Though the dissenters in *Flynt* disagreed with the premise of the Court's holding, and contended that that case was a First Amendment dispute that demanded immediate attention under *Cox's* fourth exception, see 451 U. S., at 623 (Stewart, J., dissenting); *id.*, at 623–624 (STEVENS, J.,

---

[5] The Federal RICO statute also permits prosecutions for a pattern of obscenity violations, in a manner quite similar to the Indiana law under review here.    See 18 U. S. C. § 1961(1) (1982 ed., Supp. IV).    Thus, the "outcome of this case may . . . determine the constitutionality of using obscenity crimes as predicate acts in the federal RICO statute."    See Brief for United States as *Amicus Curiae* 2.

In addition, several States have followed Congress' lead, and have added obscenity-related offenses to the list of predicate offenses that can give rise to violations of their state RICO laws.    See, *e. g.*, Ariz. Rev. Stat. Ann. § 13–2301 (Supp. 1988–1989); Ind. Code § 35–45–6–1 (1988); Ga. Code Ann. § 16–14–3(3)(A)(xii) (1988); Conn. Gen. Stat. § 53–394 (1985); Cal. Penal Code Ann. § 186.2(a)(19) (West 1988).

dissenting), the fact is that no Member of the Court concluded in *Flynt*—as JUSTICE O'CONNOR does today—that where an important First Amendment claim *is* before us, the Court should refuse to invoke *Cox*'s fourth exception and hold that we have no authority to address the issue.

Consequently, we conclude that this case, which clearly involves a First Amendment challenge to the facial validity of the Indiana RICO statute, merits review under the fourth exception recognized by *Cox* to the finality rule.

B

Petitioner's broadest contention is that the Constitution forbids the use of obscenity violations as predicate acts for a RICO conviction. Petitioner's argument in this regard is twofold: first, that the Indiana RICO law, as applied to an "enterprise" that has allegedly distributed obscene materials, is unconstitutionally vague; and second, that the potential punishments available under the RICO law are so severe that the statute lacks a "necessary sensitivity to first amendment rights," Brief for Petitioner in No. 87–614, p. 23. We consider each of these arguments in turn.

(1)

The "racketeering activities" forbidden by the Indiana RICO law are a "pattern" of multiple violations of certain substantive crimes, of which distributing obscenity (Ind. Code § 35–49–3–1) is one. Ind. Code § 35–45–6–1 (1988). Thus, the RICO statute at issue wholly incorporates the state obscenity law by reference.

Petitioner argues that the "inherent vagueness" of the standards established by *Miller* v. *California*, 413 U. S. 15 (1973), are at the root of his objection to any RICO prosecution based on predicate acts of obscenity. Brief for Petitioner in No. 87–614, pp. 24–33. Yet, this is nothing less than an invitation to overturn *Miller*—an invitation that we reject. And we note that the Indiana obscenity statute, Ind. Code § 35–49–1–1 *et seq.* (1988), is closely tailored to conform

to the *Miller* standards.  Cf. *Sedelbauer* v. *State*, 428 N. E. 2d 206, 210–211 (Ind. 1981), cert. denied, 455 U. S. 1035 (1982).[6]  Moreover, petitioner's motion to dismiss the RICO charges in the trial court rested on the alleged vagueness of *that* statute, and not any alleged defect in the underlying obscenity law.  See App. 150–151, 161–167.

We find no merit in petitioner's claim that the Indiana RICO law is unconstitutionally vague as applied to obscenity predicate offenses.  Given that the RICO statute totally encompasses the obscenity law, if the latter is not unconstitutionally vague, the former cannot be vague either.  At petitioner's forthcoming trial, the prosecution will have to prove beyond a reasonable doubt each element of the alleged RICO offense, including the allegation that petitioner violated (or attempted or conspired to violate) the Indiana obscenity law. Cf. Ind. Code § 35–45–6–1 (1988); 504 N. E. 2d, at 566. Thus, petitioner cannot be convicted of violating the RICO law without first being "found guilty" of two counts of distributing (or attempting to, or conspiring to, distribute) obscene materials.

It is true, as petitioner argues, Brief for Petitioner in No. 87–614, pp. 16–18, that the punishments available in a RICO prosecution are different from those for obscenity violations. But we fail to see how this difference renders the RICO statute void for *vagueness*.[7]

---

[6] The definition of obscenity found in the relevant statute provides that a book or film (a "matter," in the law's parlance) is obscene if:

"(1) the average person, applying contemporary community standards, finds that the dominant theme of the matter or performance, taken as a whole, appeals to the prurient interest in sex;

"(2) the matter or performance depicts or describes, in a patently offensive way, sexual conduct; and

"(3) the matter or performance, taken as a whole, lacks serious literary, artistic, political, or scientific value."  Ind. Code § 35–49–2–1 (1988). Cf. *Pope* v. *Illinois*, 481 U. S. 497, 501–502, n. 4 (1987); *Miller* v. *California*, 413 U. S., at 25–26.

[7] Indeed, because the scope of the Indiana RICO law is more limited than the scope of the State's obscenity statute—with obscenity-related

(2)

Petitioner's next contention rests on the difference between the sanctions imposed on obscenity law violators and those imposed on convicted "racketeers": the sanctions imposed on RICO violators are so "draconian" that they have an improper chilling effect on First Amendment freedoms, petitioner contends. See *id.*, at 12, 17. The use of such "heavy artillery" from the "war on crime" against obscenity is improper, petitioner argues, and therefore, obscenity offenses should not be permitted to be used as predicate acts for RICO purposes.

It is true that the criminal penalties for a RICO violation under Indiana law, a Class C felony, are more severe than those authorized for an obscenity offense, a Class A misdemeanor. Specifically, if petitioner is found guilty of the two RICO counts against him, he faces a maximum sentence of 10 years in prison and a $20,000 fine; if petitioner were convicted instead of only the six predicate obscenity offenses charged in the indictments, the maximum punishment he could face would be six years in jail and $30,000 in fines. Compare Ind. Code § 35–50–2–6 (1988), with Ind. Code § 35–50–3–2 (1988). While the RICO punishment is obviously greater than that for obscenity violations, we do not perceive any constitutionally significant difference between the two potential punishments.[8] Indeed, the Indiana RICO provisions in this respect function quite similarly to an en-

RICO prosecutions possible only where one is guilty of a "pattern" of obscenity violations—it would seem that the RICO statute is inherently *less* vague than any state obscenity law: a prosecution under the RICO law will be possible only where all the elements of an obscenity offense are present, and then some.

[8] We have in the past upheld the constitutionality of statutes that provide criminal penalties for obscenity offenses that are not significantly different from those provided in the Indiana RICO law. See, *e. g.*, *Smith* v. *United States*, 431 U. S. 291, 296, n. 3 (1977) (5-year prison term and $5,000 fine for first offense; 10-year term and $10,000 fine for each subsequent violation); *Ginzburg* v. *United States*, 383 U. S. 463, 464–465, n. 2 (1966) (5-year prison term and $5,000 fine).

hanced sentencing scheme for multiple obscenity violations. As such, "[i]t is not for this Court . . . to limit the State in resorting to various weapons in the armory of the law." *Kingsley Books, Inc.* v. *Brown,* 354 U. S. 436, 441 (1957).

It may be true that the stiffer RICO penalties will provide an additional deterrent to those who might otherwise sell obscene materials; perhaps this means—as petitioner suggests, Brief for Petitioner in No. 87–614, pp. 20–22—that some cautious booksellers will practice self-censorship and remove First Amendment protected materials from their shelves. But deterrence of the sale of obscene materials is a legitimate end of state antiobscenity laws, and our cases have long recognized the practical reality that "any form of criminal obscenity statute applicable to a bookseller will induce some tendency to self-censorship and have some inhibitory effect on the dissemination of material not obscene." *Smith* v. *California,* 361 U. S. 147, 154–155 (1959). Cf. also *Arcara* v. *Cloud Books, Inc.,* 478 U. S. 697, 706 (1986). The mere assertion of some possible self-censorship resulting from a statute is not enough to render an antiobscenity law unconstitutional under our precedents.

Petitioner further raises the question whether the civil sanctions available against RICO violations—under the CRRA statute—are so severe as to render the RICO statute itself unconstitutional. See, *e. g.,* Brief for Petitioner in No. 87–614, pp. 22–23. However, this contention is not ripe, since the State has not sought any civil penalties in this case. These claims can only be reviewed when (or if) such remedies are enforced against petitioner.

Consequently, we find no constitutional bar to the State's inclusion of substantive obscenity violations among the predicate offenses under its RICO statute.

## C

Finally, petitioner advances two narrower objections to the application of the Indiana RICO statute in obscenity-related prosecutions.

## (1)

First, petitioner contends that even if the statute is constitutional on its face, "the First Amendment . . . requires that predicate obscenity offenses must be affirmed convictions on successive dates . . . in the same jurisdiction as that where the RICO charge is brought." *Id.*, at 33.

We find no constitutional basis for the claim that the alleged predicate acts used in a RICO/obscenity prosecution must be "affirmed convictions." We rejected a like contention, albeit in dicta, when considering a case under the Federal RICO statute. See *Sedima, S. P. R. L.* v. *Imrex Co.*, 473 U. S. 479, 488 (1985). We see no reason for a different rule where the alleged predicate acts are obscenity. As long as the standard of proof is the proper one with respect to all of the elements of the RICO allegation—including proof, beyond a reasonable doubt, of the requisite number of constitutionally proscribable predicate acts—all of the relevant constitutional requirements have been met. The analogy suggested by the United States in its *amicus* brief is apt: "This Court has never required a State to fire warning shots, in the form of misdemeanor prosecutions, before it may bring felony charges for distributing obscene materials." Brief for United States as *Amicus Curiae* 16. We likewise decline to impose such a "warning shot" requirement here.

The second aspect of this claim—that all of the predicate offenses charged must have occurred in the jurisdiction where the RICO indictment is brought—also lacks merit. This contention must be rejected in this case, if for no other reason than the fact that all of petitioner's alleged predicate acts of distributing obscenity *did* take place in the same jurisdiction (Howard County) where the RICO prosecution was initiated; petitioner lacks standing to advance this claim on these facts. See App. 138–149. More significantly, petitioner's suggestion fails because such a rule would essentially turn the RICO statute on its head: barring RICO prosecutions of large national enterprises that commit single predicate offenses in numerous jurisdictions, for example.

Of course, petitioner is correct when he argues that "community standards" may vary from jurisdiction to jurisdiction where different predicate obscenity offenses allegedly were committed. But as long as, for example, each previous obscenity conviction was measured by the appropriate community's standard, we see no reason why the RICO prosecution—alleging a pattern of such violations—may take place only in a jurisdiction where two or more such offenses have occurred. Cf. *Smith* v. *United States*, 431 U. S. 291, 306–309 (1977).

(2)

Second, petitioner contends that he should have been provided with a prompt adversarial hearing, shortly after his arrest, on the question of the obscenity of the materials he allegedly distributed. Brief for Petitioner in No. 87–614, pp. 36–37.

This contention lacks merit for several reasons. First, it does not appear that petitioner requested such a hearing below. See App. 135–137. Second, unlike No. 87–470, in this case, there was no seizure of any books or films owned by petitioner. The only expressive materials "seized" by Howard County officials in this case were a few items purchased by police officers in connection with their investigation of petitioner's stores. See *id.*, at 138–147. We have previously rejected the argument that such purchases trigger constitutional concerns. See *Maryland* v. *Macon*, 472 U. S. 463, 468–471 (1985).

We consequently affirm the judgment in No. 87–614.

III

We reverse, however, the judgment in No. 87–470 sustaining the pretrial seizure order.

In a line of cases dating back to *Marcus* v. *Search Warrant*, 367 U. S. 717 (1961), this Court has repeatedly held that rigorous procedural safeguards must be employed before expressive materials can be seized as "obscene." In *Marcus*,

and again in *A Quantity of Copies of Books* v. *Kansas*, 378 U. S. 205 (1964), the Court invalidated large-scale confiscations of books and films, where numerous copies of selected books were seized without a prior adversarial hearing on their obscenity. In those cases, and the ones that immediately came after them, the Court established that pretrial seizures of expressive materials could only be undertaken pursuant-to a "procedure 'designed to focus searchingly on the question of obscenity.'" *Id.*, at 210 (quoting *Marcus, supra*, at 732). See also, *e. g.*, *Lee Art Theatre, Inc.* v. *Virginia*, 392 U. S. 636 (1968).

We refined that approach further in our subsequent decisions. Most importantly, in *Heller* v. *New York*, 413 U. S. 483, 492 (1973), the Court noted that "seizing films to destroy them or to block their distribution or exhibition is a very different matter from seizing a single copy of a film for the *bona fide* purpose of preserving it as evidence in a criminal proceeding." As a result, we concluded that until there was a "judicial determination of the obscenity issue in an adversary proceeding," exhibition of a film could not be restrained by seizing all the available copies of it. *Id.*, at 492–493. The same is obviously true for books or any other expressive materials. While a single copy of a book or film may be seized and retained for evidentiary purposes based on a finding of probable cause, the publication may not be taken out of circulation completely until there has been a determination of obscenity after an adversary hearing. *Ibid.*; see *New York* v. *P. J. Video, Inc.*, 475 U. S. 868, 874–876 (1986).

Thus, while the general rule under the Fourth Amendment is that any and all contraband, instrumentalities, and evidence of crimes may be seized on probable cause (and even without a warrant in various circumstances), it is otherwise when materials presumptively protected by the First Amendment are involved. *Lo–Ji Sales, Inc.* v. *New York*, 442 U. S. 319, 326, n. 5 (1979). It is "[t]he risk of prior re-

straint, which is the underlying basis for the special Fourth Amendment protections accorded searches for and seizure of First Amendment materials" that motivates this rule. *Maryland* v. *Macon, supra,* at 470. These same concerns render invalid the pretrial seizure at issue here.[9]

In its decision below, the Indiana Supreme Court did not challenge our precedents or the limitations on seizures that our decisions in this area have established. Rather, the court found those rules largely inapplicable in this case. 504 N. E. 2d, at 564–567. The court noted that the alleged predicate offenses included 39 convictions for violating the State's obscenity laws[10] and observed that the pretrial seizures (which were made in strict accordance with Indiana law) were not based on the nature or suspected obscenity of the contents of the items seized, but upon the neutral ground that the sequestered property represented assets used and acquired in the course of racketeering activity. "The rem-

---

[9] Following its ruling for petitioner, the Indiana Court of Appeals certified two questions for review to the Indiana Supreme Court:

"(a) Does the application for seizure upon probable cause shown ex parte as provided for by I. C. 34–4–30.5–3(b) violate due process guarantees provided by the Indiana and United States Constitutions.

"(b) Is the Order of seizure issued March 19, 1984, which is based upon enumerated criminal convictions a violation of the First Amendment." Record 700.

The Indiana Supreme Court answered both of these questions in the negative. *4447 Corp.* v. *Goldsmith,* 504 N. E. 559, 566–567 (1987). Because we dispose of petitioner's claims on First Amendment grounds, we need not reach any due process questions that may be involved in this case.

[10] Respondent suggested at argument, see Tr. of Oral Arg. 43, 53, that the fact that petitioner (and/or those employed by petitioner) had numerous prior *convictions* for obscenity offenses sufficed to justify this pretrial seizure even if it were otherwise impermissible. But the state trial court did not purport to impose the seizure as a punishment for the past criminal acts (even if such a punishment were permissible under the First Amendment). Instead, as noted above, the seizure was undertaken to prevent future violations of Indiana's RICO laws; as a prospective, pretrial seizure, it was required to comply with the *Marcus* v. *Search Warrant,* 367 U. S. 717 (1961), line of cases, which (as we explain below) it did not.

edy of forfeiture is intended not to restrain the future distribution of presumptively protected speech but rather to disgorge assets acquired through racketeering activity. Stated simply, it is irrelevant whether assets derived from an alleged violation of the RICO statute are or are not obscene." *Id.*, at 565. The court also specifically rejected petitioner's claim that the legislative inclusion of violations of obscenity laws as a form of racketeering activity was "merely a semantic device intended to circumvent well-established First Amendment doctrine." *Id.*, at 564. The assets seized were subject to forfeiture "if the elements of a pattern of racketeering activity are shown," *ibid.*; there being probable cause to believe this was the case here, the pretrial seizure was permissible, the Indiana Supreme Court concluded.

We do not question the holding of the court below that adding obscenity-law violations to the list of RICO predicate crimes was not a mere ruse to sidestep the First Amendment. And for the purpose of disposing of this case, we assume without deciding that bookstores and their contents are forfeitable (like other property such as a bank account or a yacht) when it is proved that these items are property actually used in, or derived from, a pattern of violations of the State's obscenity laws.[11] Even with these assumptions, though, we find the seizure at issue here unconstitutional. It is incontestable that these proceedings were begun to put an end to the sale of obscenity at the three bookstores named in the complaint, and hence we are quite sure that the special rules applicable to removing First Amendment materials from circulation are relevant here. This includes specifically

---

[11] Contrary to petitioner's urging, see Brief for Petitioner in No. 87–470, pp. 44–45, we do not reach the question of the constitutionality of post-trial forfeiture—or any other civil post-trial sanction authorized by the Indiana RICO/CRRA laws—in this context. The case before us does not involve such a forfeiture, and we see no reason to depart from our usual practice of deciding only "'concrete legal issues, presented in actual cases . . . .'" *Public Workers* v. *Mitchell*, 330 U. S. 75, 89 (1947); see also *Electric Bond & Share Co.* v. *SEC*, 303 U. S. 419, 443 (1938).

the admonition that probable cause to believe that there are valid grounds for seizure is insufficient to interrupt the sale of presumptively protected books and films.

Here there was not—and has not been—any determination that the seized items were "obscene" or that a RICO violation *has occurred.* True, the predicate crimes on which the seizure order was based had been adjudicated and are unchallenged. But the petition for seizure and the hearing thereon were aimed at establishing no more than *probable cause to believe* that a RICO violation had occurred, and the order for seizure recited no more than probable cause in that respect. As noted above, our cases firmly hold that mere probable cause to believe a legal violation has transpired is not adequate to remove books or films from circulation. See, *e. g.,* *New York* v. *P. J. Video, Inc.,* 475 U. S. 868 (1986); *Heller* v. *New York,* 413 U. S. 483 (1973). The elements of a RICO violation other than the predicate crimes remain to be established in this case; *e. g.,* whether the obscenity violations by the three corporations or their employees established a pattern of racketeering activity, and whether the assets seized were forfeitable under the State's CRRA statute. Therefore, the pretrial seizure at issue here was improper.

The fact that respondent's motion for seizure was couched as one under the Indiana RICO law—instead of being brought under the substantive obscenity statute—is unavailing. As far back as the decision in *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697, 720–721 (1931), this Court has recognized that the way in which a restraint on speech is "characterized" under state law is of little consequence. See also *Schad* v. *Mount Ephraim,* 452 U. S. 61, 67–68 (1981); *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S. 546, 552–555 (1975). For example, in *Vance* v. *Universal Amusement Co.,* 445 U. S. 308 (1980) *(per curiam),* we struck down a prior restraint placed on the exhibitions of films under a Texas "public nuisance" statute, finding that its failure to

comply with our prior case law in this area was a fatal defect. Cf. also *Arcara* v. *Cloud Books, Inc.*, 478 U. S., at 708 (O'CONNOR, J., concurring) (noting that if a "city were to use a nuisance statute as a pretext for closing down a bookstore because it sold indecent books . . . the case would clearly implicate First Amendment concerns and require analysis under the appropriate First Amendment standard of review"). While we accept the Indiana Supreme Court's finding that Indiana's RICO law is not "pretextual" as applied to obscenity offenses, it is true that the State cannot escape the constitutional safeguards of our prior cases by merely recategorizing a pattern of obscenity violations as "racketeering."

At least where the RICO violation claimed is a pattern of racketeering that can be established only by rebutting the presumption that expressive materials are protected by the First Amendment,[12] that presumption is not rebutted until the claimed justification for seizing books or other publications is properly established in an adversary proceeding. Here, literally thousands of books and films were carried away and taken out of circulation by the pretrial order. See App. 87; Record 601–627. Yet it remained to be proved whether the seizure was actually warranted under the Indiana CRRA and RICO statutes. If we are to maintain the regard for First Amendment values expressed in our prior decisions dealing with interrupting the flow of expressive materials, the judgment of the Indiana Court must be reversed.[13]

---

[12] We do not hold today that the pretrial seizure of petitioner's nonexpressive property was invalid. Petitioner did not challenge this aspect of the seizure here.

[13] Although it is of no direct significance, we note that the Federal Government—which has a RICO statute similar to Indiana's, 18 U. S. C. § 1961 *et seq.*—does not pursue pretrial seizure of expressive materials in its RICO actions against "adult bookstores" or like operations. See Brief

## IV

For the reasons given above, the judgment in No. 87–470 is reversed, and the case is remanded for further proceedings. The judgment in No. 87–614 is affirmed, and it too is remanded for further proceedings.

*It is so ordered.*

JUSTICE BLACKMUN, concurring in part and concurring in the judgment.

Although I agree with JUSTICE O'CONNOR in her conclusion that the *Sappenfield* case, No. 87–614, is not properly here under 28 U. S. C. § 1257, a majority of the Court has decided otherwise. This majority on the jurisdictional issue, however, is divided 4 to 3 on the merits of the question presented in *Sappenfield:* whether the distribution of constitutionally obscene materials may be punished as predicate acts of a racketeering offense. Disposition of the case deserves — if not requires — a majority of participating Justices. See *Screws* v. *United States,* 325 U. S. 91, 134 (1945) (Rutledge, J., concurring in result).

Thus, notwithstanding my dissenting jurisdictional view, I feel obligated to reach the merits in *Sappenfield.* See *United States* v. *Vuitch,* 402 U. S. 62, 97–98 (1971) (separate statement). Because I agree that what may be punished under *Miller* v. *California,* 413 U. S. 15 (1973), may form the basis of a racketeering conviction, I join JUSTICE WHITE's opinion (except for Part II–A) and the judgment of the Court.

JUSTICE O'CONNOR, concurring in part and dissenting in part.

Because I believe that this Court does not have jurisdiction to hear the petition in *Sappenfield* v. *Indiana,* No. 87–614, I dissent from the Court's disposition of that case. I concur in

for United States as *Amicus Curiae* 15, n. 12; cf. *United States* v. *Pryba,* 674 F. Supp. 1504, 1508, n. 16 (ED Va. 1987).

the Court's disposition of *Fort Wayne Books, Inc.* v. *Indiana*, No. 87–470, which presents, among others, the same question as presented in *Sappenfield*.

Petitioners Sappenfield and his bookstore corporations, Fantasy One, Inc., and Fantasy Two, Inc., have yet to be tried or convicted on the Racketeer Influenced and Corrupt Organizations (RICO) counts brought against them by the State of Indiana. Petitioners' motion to dismiss the RICO counts and the State's subsequent appeal were, therefore, interlocutory. Except in limited circumstances, this Court has jurisdiction only to review final judgments rendered by the highest court of the State in which decision may be had. 28 U. S. C. § 1257. See *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469 (1975). As we observed in *Flynt* v. *Ohio*, 451 U. S. 619, 620 (1981) *(per curiam)*, a case involving violations of Ohio's obscenity statute, "[a]pplied in the context of a criminal prosecution, finality is normally defined by the imposition of the sentence." Neither a finding of guilt nor imposition of sentence has yet occurred in *Sappenfield*. As in *Flynt*, were we to assume jurisdiction over *Sappenfield*, there would be some "probability of piecemeal review with respect to federal issues [because] [i]t appears that other federal issues will be involved in the trial court, such as whether or not the publication[s] at issue [are] obscene." 451 U. S., at 621. Similarly, as in *Flynt*, "delaying review until petitioners are convicted, if they are, would [not] seriously erode federal policy within the meaning of our prior cases. . . . That this case involves an obscenity prosecution does not alter the conclusion." *Id.*, at 622. The Court's assumption of jurisdiction based on its determination that "[a]djudicating the proper scope of First Amendment protections . . . merits application of an exception to the general finality rule," *ante*, at 55, essentially expands the fourth *Cox* exception to permit review of any state interlocutory orders implicating the First Amendment. Such a broad expansion of the narrow excep-

tions to the statutory limitations on our jurisdiction is completely unwarranted. Ironically, the petition in *Fort Wayne Books* makes this expansion unnecessary as well. Accordingly, I would dismiss the writ of certiorari in *Sappenfield* for want of jurisdiction.

The petition in *Fort Wayne Books* is also from an interlocutory appeal to the Indiana appellate courts. In this case, however, pretrial sanctions have already been imposed on petitioner. Where First Amendment interests are actually affected, we have held that such interlocutory orders are immediately reviewable by this Court. *National Socialist Party of America* v. *Skokie,* 432 U. S. 43 (1977) *(per curiam).* Although *Fort Wayne Books* is a civil action brought under Indiana's Civil Remedies for Racketeering Activity statute, such civil actions depend on pre-existing violations of the State's criminal RICO statute. See *ante,* at 50–51. Consequently, the question presented in *Sappenfield*—whether violations of Indiana's obscenity statute may be predicate acts for charges brought under the State's criminal RICO statute—is also presented in *Fort Wayne Books.* Were it unconstitutional for Indiana to include obscenity violations among possible predicate acts for RICO violations, the civil remedies sought in *Fort Wayne Books* would be equally invalid. I fully agree with the Court's disposition of this question as it applies to *Fort Wayne Books.* There is "no constitutional bar to the State's inclusion of substantive obscenity violations among the predicate offenses under its RICO statute." *Ante,* at 60. I also agree and concur with the Court's statement of the cases in Part I and its disposition in Part III of the separate questions presented in *Fort Wayne Books.*

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting in No. 87–614, and concurring in part and dissenting in part in No. 87–470.

The Court correctly decides that we have jurisdiction and that the pretrial seizures to which petitioner in No. 87–470

was subjected are unconstitutional. But by refusing to evaluate Indiana's Racketeer Influenced and Corrupt Organizations (RICO) and Civil Remedies for Racketeering Activity (CRRA) statutes as an interlinked whole, the Court otherwise reaches the wrong result.

It is true that a bare majority of the Court has concluded that delivery of obscene messages to consenting adults may be prosecuted as a crime.[1] The Indiana Legislature has

---

[1] Each of the cases the Court cites to demonstrate that this proposition is "well established," *ante,* at 54, n. 4, was decided by a 5-to-4 vote. The dissenters in *Kingsley Books, Inc.* v. *Brown,* 354 U. S. 436 (1957), were Chief Justice Warren and Justices Black, Douglas, and BRENNAN; in *Miller* v. *California,* 413 U. S. 15 (1973), Justices Douglas, BRENNAN, Stewart, and MARSHALL dissented. In *Splawn* v. *California,* 431 U. S. 595 (1977), and *Pinkus* v. *United States,* 436 U. S. 293 (1978), Justices BRENNAN, Stewart, MARSHALL, and STEVENS expressed the opinion that criminal prosecution for obscenity-related offenses violates the First Amendment.

In 1970, moreover, the President's Commission on Obscenity and Pornography advocated that laws regulating adults' access to sexually explicit materials be repealed. Report of The Commission on Obscenity and Pornography 51–56 (1970). The most recent federal pornography commission disagreed with this conclusion yet acknowledged that scholarly comment generally agrees with the dissenters:

"Numerous people, in both oral and written evidence, have urged upon us the view that the Supreme Court's approach is a mistaken interpretation of the First Amendment. They have argued that we should conclude that any criminal prosecution based on the distribution to consenting adults of sexually explicit material, no matter how offensive to some, and no matter how hard-core, and no matter how devoid of literary, artistic, political, or scientific value, is impermissible under the First Amendment.

"We have taken these arguments seriously. In light of the facts that the Supreme Court did not in *Roth* [v. *United States,* 354 U. S. 476 (1957)] or since unanimously conclude that obscenity is outside of the coverage of the First Amendment, and that its 1973 rulings [*Miller* v. *California,* 413 U. S. 15; *Paris Adult Theatre I* v. *Slaton,* 413 U. S. 49; *Kaplan* v. *California,* 413 U. S. 115; *United States* v. *12 200-ft. Reels of Film,* 413 U. S. 123; *United States* v. *Orito,* 413 U. S. 139] were all decided by a scant 5–4 majority on this issue, there is no doubt that the issue was debatable within the Supreme Court, and thus could hardly be without difficulty. Moreover, we recognize that the bulk of scholarly commentary is of the opinion that the Supreme Court's resolution of and basic approach

done far more than that: by injecting obscenity offenses into a statutory scheme designed to curtail an entirely different kind of antisocial conduct, it has not only enhanced criminal penalties, but also authorized wide-ranging civil sanctions against both protected and unprotected speech. In my judgment there is a vast difference between the conclusion that a State may proscribe the distribution of obscene materials and the notion that this legislation can survive constitutional scrutiny.

## I

At the outset it is important to identify the limited nature of the "racketeering activity" alleged in No. 87–614. Petitioner is accused of selling to the same willing purchaser three obscene magazines in each of two stores. There is no charge that anyone engaged in any sexual misconduct on petitioner's premises,[2] that his stores displayed or advertised their inventory in an offensive way,[3] that children were given access to any of their publications or films,[4] or that they foisted any obscene messages upon unwilling recipients.[5] There is no claim that petitioner's bookstores are public nuisances operating in inappropriate places, manners, or times.[6]

---

to the First Amendment issues is incorrect." 1 Attorney General's Commission on Pornography, Final Report 260–261 (July 1986) (hereinafter Report).

[2] See, e. g., Arcara v. Cloud Books, Inc., 478 U. S. 697 (1986).

[3] See Splawn v. California, 431 U. S., at 602 (STEVENS, J., dissenting); Commonwealth v. American Booksellers Assn., Inc., 236 Va. 168, 372 S. E. 2d 618 (1988), answering questions certified in 484 U. S. 383 (1988).

[4] See New York v. Ferber, 458 U. S. 747 (1982); Ginsberg v. New York, 390 U. S. 629 (1968).

[5] See Erznoznik v. City of Jacksonville, 422 U. S. 205 (1975); Miller v. California, 413 U. S., at 18.

[6] See Renton v. Playtime Theatres, Inc., 475 U. S. 41 (1986); Young v. American Mini Theatres, Inc., 427 U. S. 50 (1976).

In Indiana the sale of an obscene magazine is a misde-meanor.[7] A person who commits two such misdemeanors, however, engages in a "pattern of racketeering activity" as defined in the State's RICO statute.[8] If by means of that pattern the person acquires, maintains, or otherwise oper-ates an "enterprise,"[9] he or she commits the Indiana felony

---

[7] The Indiana obscenity law underlying these cases provides that a "per-son who knowingly or intentionally

"(1) sends or brings into Indiana obscene matter for sale or distribution; or

"(2) offers to distribute, distributes, or exhibits to another person ob-scene matter;

"commits a class A misdemeanor." Ind. Code § 35–49–3–1 (1988), enacted by 1983 Ind. Acts 311, § 33, to replace identically worded § 35–30–10.1–2, which had been repealed by 1983 Ind. Acts 311, § 49.

Indiana punishes Class A misdemeanors with fines of up to $5,000 and imprisonment of up to one year. § 35–50–3–2.

[8] Indiana Code § 35–45–6–1, entitled "Racketeer Influenced and Corrupt Organizations," provides in part:

" 'Pattern of racketeering activity' means engaging in at least two (2) in-cidents of racketeering activity that have the same or similar intent, result, accomplice, victim, or method of commission, or that are otherwise interre-lated by distinguishing characteristics that are not isolated incidents . . . .

" 'Racketeering activity' means to commit, to attempt to commit, or to conspire to commit . . . a violation of IC 35–49–3; murder (IC 35–42–1–1); battery as a Class C felony (IC 35–42–2–1); kidnapping (IC 35–42–3–2); child exploitation (IC 35–42–4–4); robbery (IC 35–42–5–1); arson (IC 35–43–1–1); burglary (IC 35–43–2–1); theft (IC 35–43–4–2); receiving stolen property (IC 35–43–4–2) . . . ."

This enumeration of predicate offenses inexplicably omits a parenthetical description of Ind. Code § 35–49–3. That latter statute is Indiana's cur-rent obscenity law, which makes it a misdemeanor to disseminate or dis-tribute matter that is obscene or harmful to minors, or to present a per-formance that is obscene or harmful to minors.

[9] The term "enterprise" is defined in both the Racketeer Influenced and Corrupt Organizations (RICO) Act and the Civil Remedies for Racketeer-ing Activity (CRRA) Act to include a sole proprietorship and a corporation. See Ind. Code §§ 35–45–6–1, 34–4–30.5–1 (1988). Thus, each of the stores at which obscenity offenses allegedly occurred is an enterprise within the

of "corrupt business influence." [10]    Thus does Indiana's RICO Act transform two obscenity misdemeanors into a felony punishable by up to eight years of imprisonment. [11]

Proof of a RICO violation further exposes a defendant to the civil sanctions prescribed in the CRRA Act, including an order dissolving the enterprise, forfeiting its property to the State, and enjoining the defendant from engaging in the same type of business in the future.    Ind. Code §§ 34–4–30.5–2 to 34–4–30.5–4 (1988). [12]    Thus, even if only a small fraction of

meaning of Indiana RICO.    Cf. *Alvers* v. *State*, 489 N. E. 2d 83, 89 (Ind. App. 1986) (corporation is an enterprise within the meaning of State RICO Act).

[10] Indiana Code § 35–45–6–2(a) (1988) provides that a "person

"(1) who has knowingly or intentionally received any proceeds directly or indirectly derived from a pattern of racketeering activity, and who uses or invests those proceeds or the proceeds derived from them to acquire an interest in real property or to establish or to operate an enterprise;

"(2) who through a pattern of racketeering activity, knowingly or intentionally acquires or maintains, either directly or indirectly, an interest in or control of real property or an enterprise; or

"(3) who is employed by or associated with an enterprise, and who knowingly or intentionally conducts or otherwise participates in the activities of that enterprise through a pattern of racketeering activity;

"commits corrupt business influence, a Class C felony."

[11] Under Indiana law, a person convicted of a Class C felony such as this is subject to a $10,000 fine and to a term of five years, which may be increased to eight or reduced to two years.    Ind. Code § 35–50–2–6 (1988).

[12] Eschewing criminal proceedings, the prosecutor in No. 87–470 brought a civil action alleging a RICO violation and seeking the gamut of relief available under the CRRA Act.    App. 7–49.    The trial court found probable cause to believe that the Indiana RICO statute had been violated and the bookstore padlocked and its inventory, furnishings, and other contents seized.    Petitioner in No. 87–470 appealed on a number of constitutional grounds.    Consolidating petitioner's case with one originating in Indianapolis, the Indiana Court of Appeals held that the relevant RICO/CRRA provisions violate the First and Fourteenth Amendments to the Constitution. *4447 Corp.* v. *Goldsmith*, 479 N. E. 2d 578 (1985).

A few months after this opinion issued, a trial judge granted the motion of petitioners in No. 87–614 to dismiss the two RICO charges against them

the activities of the enterprise is unlawful, the State may close the entire business, seize its inventory, and bar its owner from engaging in his or her chosen line of work.

In its decision upholding the constitutionality of the Indiana RICO/CRRA scheme, the Indiana Supreme Court expressly approved the civil remedies as well as the criminal sanctions, and unequivocally rejected the suggestion that the nature of a business or of its assets should affect a court's remedial powers. *4447 Corp.* v. *Goldsmith*, 504 N. E. 2d 559 (1987). It categorically stated that if the elements of a pattern of racketeering activity have been proved, all of a bookstore's expressive materials, obscene or not, are subject to forfeiture.[13]

---

on the ground that Indiana's RICO statute is unconstitutionally vague. The Indiana Supreme Court subsequently reversed the Indiana Court of Appeals in No. 87–470, sustaining the RICO/CRRA statutes and the actual pretrial seizures. *4447 Corp.* v. *Goldsmith*, 504 N. E. 2d 559 (1987). The Indiana Appellate Court then reversed the dismissal of the RICO counts against petitioners in No. 87–614. *State* v. *Sappenfield*, 505 N. E. 2d 504 (1987).

[13] The Indiana Supreme Court explained:

"We believe the overall purpose of the RICO statute is as applicable to obscenity violations as it is to the other enumerated predicate offenses which have no conceivable First Amendment ramifications. Thus we cannot agree with either appellants or the Court of Appeals that the purpose of the Indiana RICO/CRRA scheme, as it pertains to the predicate offense of obscenity, is to restrain the sale or distribution of expressive materials. It is irrelevant whether assets acquired through racketeering activity are obscene or not. They are subject to forfeiture if the elements of a pattern of racketeering activity are shown. The other CRRA remedies, such as license revocation, are also available regardless of the nature of the racketeering enterprise." 504 N. E. 2d, at 564.

"[T]he purpose of the forfeiture provisions is totally unrelated to the nature of the assets in question. The overall purpose of the anti-racketeering laws is unequivocal, even where the predicate offense alleged is a violation of the obscenity statute. The remedy of forfeiture is intended not to restrain the future distribution of presumptively protected speech but rather to disgorge assets acquired through racketeering activity. Stated simply,

## II

This Court finds no merit in the claim that Indiana's RICO law is unconstitutionally vague as applied to obscenity predicate offenses. Since Indiana's obscenity law satisfies the strictures set out in *Miller* v. *California*, 413 U. S. 15 (1973), the Court reasons, the predicate offense is not too vague; necessarily, a "pattern" of such offenses is even less vague. See *ante*, at 57–58, and n. 7. This is a non sequitur. Reference to a "pattern" of at least two violations only compounds the intractable vagueness of the obscenity concept itself.[14] The Court's contrary view rests on a construction of the RICO statute that requires nothing more than proof that a defendant sold or exhibited to a willing reader two obscene magazines — or perhaps just two copies of one such magazine. I would find the statute unconstitutional even without the special threat to First Amendment interests posed by the CRRA remedies.[15] Instead of reiterating what I have al-

it is irrelevant whether assets derived from an alleged violation of the RICO statute are or are not obscene." *Id.*, at 565.

"In sum, these actions seeking various CRRA remedies were instituted in an attempt to compel the forfeiture of the proceeds of alleged racketeering activity and not to restrain the future distribution of expressive materials. We hold that the RICO/CRRA statutes as they pertain to the predicate offense of obscenity do not violate the First and Fourteenth Amendments of the United States Constitution." *Id.*, at 565–566.

[14] See, *e. g.*, *Marks* v. *United States*, 430 U. S. 188, 198 (1977) (STEVENS, J., concurring in part and dissenting in part); *Paris Adult Theatre I* v. *Slaton*, 413 U. S. 49, 85 (1973) (BRENNAN, J., joined by Stewart and MARSHALL, JJ., dissenting).

Ironically, the legal test for determining the existence of a pattern of racketeering activity has been likened to "Justice Stewart's famous test for obscenity—'I know it when I see it'—set forth in his concurrence in *Jacobellis* v. *Ohio*, 378 U. S. 184, 197 [(1964)]." *Morgan* v. *Bank of Waukegan*, 804 F. 2d 970, 977 (CA7 1986) (citing *Papai* v. *Cremosnik*, 635 F. Supp. 1402, 1410 (ND Ill. 1986)).

[15] It long has been "my conviction that government may not constitutionally criminalize mere possession or sale of obscene literature, absent some connection to minors or obtrusive display to unconsenting adults." *Pope* v. *Illinois*, 481 U. S. 497, 513 (1987) (STEVENS, J., dissenting). See

ready written, however, I shall limit this opinion to a discussion of the significance of the civil remedies.

I disagree with the Court's view that questions relating to the severity of the civil sanctions that may follow a RICO conviction are not ripe for review. See *ante*, at 60. For the Indiana Supreme Court's opinion in *4447 Corp.* v. *Goldsmith*, *supra*, makes it perfectly clear that the RICO and CRRA Acts, enacted at the same time and targeting precisely the same subject matter, are parts of a single statutory scheme. It is also obvious that the principal purpose of proving a pattern of racketeering activity is to enable the prosecutor to supplement criminal penalties with unusually severe civil sanctions. The Indiana court's descriptions of the "overall purpose of the anti-racketeering laws"[16] and specifically of "the purpose of the Indiana RICO/CRRA scheme as it pertains to the predicate offense of obscenity"[17] confirm what is in any event an obvious reading of this legislation. The significance of making obscenity a predicate offense comparable to murder, kidnaping, extortion, or arson cannot be evaluated fairly if the CRRA portion of the RICO/CRRA scheme is ignored.

### III

Recurrent in the history of obscenity regulation is an abiding concern about media that have a "tendency to deprave or corrupt" those who view them, "to stir sexual impulses and lead to sexually impure thoughts," or to "appeal . . . to prurient interest." See *Alberts* v. *California* (decided with *Roth* v. *United States*), 354 U. S. 476, 498–499 (1957) (Harlan, J.,

---

*Smith* v. *United States*, 431 U. S. 291, 311, 315–316 (1977) (STEVENS, J., dissenting). See also *Ward* v. *Illinois*, 431 U. S. 767, 777–782 (1977) (STEVENS, J., dissenting); *Splawn* v. *California*, 431 U. S., at 602 (STEVENS, J., dissenting); *Marks* v. *United States*, 430 U. S., at 198 (STEVENS, J., concurring in part and dissenting in part). Cf. *Pinkus* v. *United States*, 436 U. S., at 305 (STEVENS, J., concurring) (in the absence of Court's precedents, would not sustain federal obscenity law).

[16] 504 N. E. 2d, at 565.

[17] *Id.*, at 564.

concurring in result). Antecedents of the statutory scheme under review in these cases plainly reflect this concern. Early Indiana statutes classified as crimes "Against Public Morals" or "Against Chastity and Morality" the distribution not only of "obscene" materials, but also of materials that were "lewd," "indecent," or "lascivious" or that described or depicted "criminals, desperadoes, or . . . men or women in lewd and unbecoming positions or improper dress." Ind. Rev. Stat. §§ 2107–2109 (1897); Ind. Code Ann. §§ 2359–2361 (Burns 1914). Prohibited in the same category were profane cursing, advertising drugs for female use, Sunday baseball, and letting stallions in public. Ind. Rev. Stat. §§ 2110, 2111, 2113, 2117 (1897); Ind. Code Ann. §§ 2362–2364, 2369, 2373 (Burns 1914). Indiana's regulation of morals offenses paralleled efforts elsewhere in the United States and in Great Britain. 1 Report, at 240–245. Cf. *Paris Adult Theatre I* v. *Slaton*, 413 U. S. 49, 104–105 (1973) (BRENNAN, J., dissenting) (outlining obscenity laws' history). Quite simply, the longstanding justification for suppressing obscene materials has been to prevent people from having immoral thoughts.[18] The failure to do so, it is argued, threatens the moral fabric of our society.[19]

---

[18] As Professor Henkin explained, American obscenity laws are "rooted in this country's religious antecedents, of governmental responsibility for communal and individual 'decency' and 'morality.'" Henkin, Morals and the Constitution: The Sin of Obscenity, 63 Colum. L. Rev. 391 (1963). He continued:

"Communities believe, and act on the belief, that obscenity is immoral, is wrong for the individual, and has no place in a decent society. They believe, too, that adults as well as children are corruptible in morals and character, and that obscenity is a source of corruption that should be eliminated. Obscenity is not suppressed primarily for the protection of others. Much of it is suppressed for the purity of the community and for the salvation and welfare of the 'consumer.' Obscenity, at bottom, is not crime. Obscenity is sin." *Id.*, at 395.

[19] In proposing the addition of state and federal obscenity violations as predicate offenses under Federal RICO, 18 U. S. C. § 1961 *et seq.*, Senator Helms stated:

Limiting society's expression of that concern is the Federal Constitution. The First Amendment presumptively protects communicative materials. See *Roaden* v. *Kentucky*, 413 U. S. 496, 504 (1973). Because the line between protected pornographic speech and obscenity is "dim and uncertain," *Bantam Books, Inc.* v. *Sullivan*, 372 U. S. 58, 66 (1963), "a State is not free to adopt whatever procedures it pleases for dealing with obscenity," *Marcus* v. *Search Warrant*, 367 U. S. 717, 731 (1961), but must employ careful procedural safeguards to assure that only those materials adjudged obscene are withdrawn from public commerce. *Freedman* v. *Maryland*, 380 U. S. 51 (1965); see *Miller* v. *California*, 413 U. S., at 23–24.[20] The Constitution confers a

---

"[W]e are experiencing an explosion in the volume and availability of pornography in our society. Today it is almost impossible to open mail, turn on the television, or walk in the downtown areas of our cities, or even in some suburban areas, without being accosted by pornographic materials. The sheer volume and pervasiveness of pornography in our society tends to make adults less sensitive to the traditional value of chaste conduct and leads children to abandon the moral values their parents have tried so hard to instill in them.

". . . Surely it is not just coincidential *[sic]* that, as *[sic]* a time in our history when pornography and obscene materials are rampant, we are also experiencing record levels of promiscuity, veneral *[sic]* disease, herpes, acquired immune deficiency syndrome (AIDS), abortion, divorce, family breakdown, and related problems. At a minimum, pornography lowers the general moral tone of society and contributes to social problems that were minimal or nonexistent in earlier periods of our history." 130 Cong. Rec. 844 (1984). The amendment was enacted in the Act of Oct. 12, 1984, Pub. L. 98–473, 98 Stat. 2143, codified at 18 U. S. C. § 1961(1) (1982 ed., Supp. IV).

[20] "To the extent, therefore, that regulation of pornography constitutes an abridgment of the freedom of speech, or an abridgment of the freedom of the press, it is at least presumptively unconstitutional. And even if some or all forms of regulation of pornography are seen ultimately not to constitute abridgments of the freedom of speech or the freedom of the press, the fact remains that the Constitution treats speaking and printing as special, and thus the regulation of anything spoken or printed must be

right to possess even materials that are legally obscene. *Stanley* v. *Georgia*, 394 U. S. 557 (1969). Moreover, public interest in access to sexually explicit materials remains strong despite continuing efforts to stifle distribution.[21]

Whatever harm society incurs from the sale of a few obscene magazines to consenting adults is indistinguishable from the harm caused by the distribution of a great volume of pornographic material that is protected by the First Amendment.[22] Elimination of a few obscene volumes or videotapes

---

examined with extraordinary care. For even when some forms of regulation of what is spoken or printed are not abridgments of the freedom of speech, or abridgments of the freedom of the press, such regulations are closer to constituting abridgments than other forms of governmental action. If nothing else, the barriers between permissible restrictions on what is said or printed and unconstitutional abridgments must be scrupulously guarded." 1 Report, at 249–250.

[21] The videotape dealers' association, for example, reports that in the "three-quarters of the nation's video stores carry[ing] adult titles," that material, often to be viewed by private individuals on their own video cassette recorders, "accounts for about 13% of their business, valued at $250 million annually." Groskaufmanis, What Films We May Watch: Videotape Distribution and the First Amendment, 136 U. Pa. L. Rev. 1263, 1273, n. 75 (1988).

The Attorney General's Commission on Pornography quotes Geoffrey R. Stone, now dean of the University of Chicago Law School, as follows: " '[T]he very fact . . . that there is a vast market in our society for sexually explicit expression suggests that for many people, this type of speech serves what they believe to be, it may be amusement, it m[a]y be containment, it may be sexual stimulation, it may be fantasy, whatever it is, many of us believe that this expression is to our own lives, in some way, valuable. That value should not be overlooked.'" 2 Report, at 1269. See also *Marks* v. *United States*, 430 U. S., at 198 (STEVENS J., concurring in part and dissenting in part) ("However distasteful these materials are to some of us, they are nevertheless a form of communication and entertainment acceptable to a substantial segment of society; otherwise, they would have no value in the marketplace").

[22] The Attorney General's Commission on Pornography highlighted this fact as follows:

"A central part of our mission has been to examine the question whether pornography is harmful. In attempting to answer this question, we have

from an adult bookstore's shelves thus scarcely serves the State's purpose of controlling public morality. But the State's RICO/CRRA scheme, like the Federal RICO law, 18 U. S. C. § 1961 *et seq.*, after which it was patterned, 504 N. E. 2d, at 560, furnishes prosecutors with "drastic methods" for curtailing undesired activity.[23] The Indiana RICO/ CRRA statutes allow prosecutors to cast wide nets[24] and seize, upon a showing that two obscene materials have been sold, or even just exhibited, all of a store's books, magazines, films, and videotapes—the obscene, those nonobscene yet sexually explicit, and even those devoid of sexual reference.[25]

---

made a conscious decision not to allow our examination of the harm question to be constricted by the existing legal/constitutional definition of the legally obscene." 1 Report, at 299.

"As a result, our inquiry into harm encompasses much material that may not be legally obscene, and also encompasses much material that would not generally be considered 'pornographic' as we use that term here." *Id.*, at 302.

"To a number of us, the most important harms must be seen in moral terms, and the act of moral condemnation of that which is immoral is not merely important but essential. From this perspective there are acts that need be seen not only as causes of immorality but as manifestations of it. Issues of human dignity and human decency, no less real for their lack of scientific measurability, are for many of us central to thinking about the question of harm. And when we think about harm in this way, there are acts that must be condemned not because the evils of the world will thereby be eliminated, but because conscience demands it." *Id.*, at 303.

[23] "Drastic methods to combat [organized crime] are essential, and we must develop law enforcement measures at least as efficient as those of organized crime." 116 Cong. Rec. 35199 (1970) (remarks of Rep. Rodino). See also *Russello* v. *United States*, 464 U. S. 16, 26–29 (1983); *United States* v. *Turkette*, 452 U. S. 576, 586–593 (1981).

[24] Cf. *United States* v. *Elliott*, 571 F. 2d 880, 903 (CA5) ("[T]he [Federal] RICO net is woven tightly to trap even the smallest fish"), cert. denied, 439 U. S. 953 (1978).

[25] The Court of Appeals of Indiana made this observation, 479 N. E. 2d, at 601:

"[T]he state concedes that the obscenity of the seized inventories of books, magazines, and films is irrelevant and need not even be alleged. This ar-

82

Reported decisions indicate that the enforcement of Indiana's RICO/CRRA statutes has been primarily directed at adult bookstores.[26] Patently, successful prosecutions would ad-

gument reflects an accurate reading of the statutes but also reveals the deeply-flawed nature of the regulatory scheme as a response to obscenity. May *avant-garde* booksellers and theaters be padlocked and forfeited to the state upon a showing that alongside literary, political, and cinematic classics, they have twice disseminated controversial works subsequently adjudged to be obscene? . . . [T]he guarantees of the First Amendment mean nothing if the state may arrogate such discretion over the continued existence of bookstores and theaters."

The State Supreme Court did not deny that the RICO/CRRA Acts permitted that result, but rather professed faith that prosecutors would not abuse the power given them under the statutes. 504 N. E. 2d, at 565, rev'g 479 N. E. 2d 578 (Ind. App. 1985).

Even the suppression only of sex-oriented materials on the borderline between protected and unprotected speech might remove a vast number of materials from circulation. See Dietz & Sears, Pornography and Obscenity Sold in "Adult Bookstores": A Survey of 5132 Books, Magazines, and Films in Four American Cities, 21 U. Mich. J. L. Ref. 7, 42 (1987-1988) (36% of materials in adult bookstores surveyed would be obscene "in the eyes of a juror with sexually liberal attitudes and values," while 100% would be obscene "in the eyes of those with sexually traditional attitudes and values").

[26] In five of the eight reported opinions reviewing prosecutions pursuant to Indiana's RICO/CRRA statutes, the predicate offenses are obscenity violations. *Sappenfield v. Indiana*, 574 F. Supp. 1034 (ND Ind. 1983) (dismissing for lack of standing suit by petitioner in No. 87–614 seeking to prevent prosecutor in LaPorte County from adding civil sanctions to criminal RICO prosecution already under way there); *4447 Corp. v. Goldsmith*, 504 N. E. 2d 559 (Ind. 1987) (case below), rev'g 479 N. E. 2d 578 (Ind. App. 1985) (Allen and Marion Counties); *Studio Art Theatre of Evansville, Inc. v. State*, 530 N. E. 2d 750 (Ind. App. 1988) (upholding RICO convictions in Vanderburgh County, based on alleged sale of movies harmful to minors); *State v. Sappenfield*, 505 N. E. 2d 504 (Ind. App. 1987) (Howard County). See also *J. N. S., Inc. v. Indiana*, 712 F. 2d 303 (CA7 1983) (dismissing for lack of standing Indianapolis distributors' suit challenging constitutionality of CRRA).

The first Federal RICO prosecution based on obscenity violations occurred in *United States v. Pryba*, Crim. No. 87–00208-A (ED Va., Nov. 10, 1987). After the District Court had rejected constitutional challenges

vance significantly the State's efforts to silence immoral speech and repress immoral thoughts.

In my opinion it is fair to identify the effect of Indiana's RICO/CRRA Acts as the specific purpose of the legislation.[27] The most realistic interpretation of the Indiana Legislature's intent in making obscenity a RICO predicate offense is to expand beyond traditional prosecution of legally obscene materials into restriction of materials that, though constitutionally protected, have the same undesired effect on the community's morals as those that are actually obscene.[28]

---

to the inclusion of obscenity offenses in the Federal RICO statute, 674 F. Supp. 1504 (ED Va. 1987), a jury found defendants " 'guilty of interstate distribution of $105.30 worth of obscene material and decided that Dennis Pryba's three Washington, D. C., area hardcore bookstores and eight videotape clubs [valued at $1 million] were forfeitable under the terms of the RICO statute.' " Eggenberger, RICO vs. Dealers in Obscene Matter: The First Amendment Battle, 22 Colum. J. L. & Soc. Probs. 71 (1988) (quoting Hayes, A Jury Wrestles with Pornography, American Lawyer 96, 97 (Mar. 1988)).

[27] "Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds. This is particularly true in the case of governmental action which is frequently the product of compromise, of collective decisionmaking, and of mixed motivation." *Washington* v. *Davis*, 426 U. S. 229, 253 (1976) (STEVENS, J., concurring). See also *Near* v. *Minnesota ex rel. Olson*, 283 U. S. 697, 708 (1931) ("[I]n passing upon constitutional questions . . . , the statute must be tested by its operation and effect").

[28] Indiana is far from the only governmental entity to have moved against undesirable, sexually explicit materials in this manner. Of 26 States besides Indiana that have passed laws patterned after the Federal RICO statute, 14 include violations of obscenity laws as predicate offenses upon which a RICO-type prosecution may be based. Ariz. Rev. Stat. Ann. § 13–2301(D)(4)(u) (Supp. 1988–1989); Colo. Rev. Stat. § 18–17–103(5)(b)(VI) (1986); Del. Code Ann., Tit. 11, §§ 1502(9)(a), (9)(b)(7) (1987); Fla. Stat. § 895.02(1)(a)(27) (1987); Ga. Code Ann. § 16–14–3(3) (A)(xii) (1988); Idaho Code § 18–7803(8) (Supp. 1988); N. J. Stat. Ann. § 2C:41–1(e) (West Supp. 1988–1989); N. C. Gen. Stat. § 75D–3(c)(2) (1987); N. D. Cent. Code § 12.1–06.1–01(2)(e)(17) (Supp. 1987); Ohio Rev. Code

Fulfillment of that intent surely would overflow the boundaries imposed by the Constitution.

The Court properly holds today that when the predicate offenses are obscenity violations, the State may not undertake the pretrial seizures of expressive materials that Indiana's RICO/CRRA legislation authorizes. See *ante*, at 66–67. Yet it does so only after excluding from its holding pretrial seizures of "nonexpressive property," *ante*, at 67, n. 12, and "assum[ing] without deciding that bookstores and their contents are forfeitable" and otherwise subject to CRRA's posttrial civil sanctions. *Ante*, at 65, and n. 11. I would extend the Court's holding to prohibit the seizure of these stores' inventories, even after trial, based on nothing more than a "pattern" of obscenity misdemeanors.

For there is a difference of constitutional dimension between an enterprise that is engaged in the business of selling and exhibiting books, magazines, and videotapes and one that is engaged in another commercial activity, lawful or unlawful. A bookstore receiving revenue from sales of obscene books is not the same as a hardware store or pizza parlor funded by loan-sharking proceeds. The presumptive First Amendment

---

Ann. §§ 2923.31(I)(1), (I)(2) (1987); Okla. Stat., Tit. 22, § 1402(10)(v) (Supp. 1988); Ore. Rev. Stat. §§ 166.715(6)(a)(T), (6)(b) (1987); Utah Code Ann. § 76–10–1602(4)(fff)-(iii), (zzz) (Supp. 1988); Wash. Rev. Code § 9A.82.010 (14)(s) (Supp. 1988).

The trend toward using RICO statutes to enforce obscenity laws comports with the urgings of the Attorney General's Commission on Pornography. 1 Report, at 435 (Recommendation "10. STATE LEGISLATURES SHOULD ENACT A RACKETEER INFLUENCED CORRUPT ORGANIZATIONS (RICO) STATUTE WHICH HAS OBSCENITY AS A PREDICATE ACT"); *id.*, at 437 (Recommendation "15. THE DEPARTMENT OF JUSTICE AND UNITED STATES ATTORNEYS SHOULD USE THE RACKETEER INFLUENCED CORRUPT ORGANIZATION ACT (RICO) AS A MEANS OF PROSECUTING MAJOR PRODUCERS AND DISTRIBUTORS OF OBSCENE MATERIAL"); *id.*, at 464, 498, 515. Cf. *id.*, at 433, 465, 472, 497 (recommending that Federal and State Governments enact statutes authorizing forfeitures even if two predicate offenses cannot be proved, barring a RICO prosecution).

protection accorded the former does not apply either to the predicate offense or to the business use in the latter. Seldom will First Amendment protections have any relevance to the sanctions that might be invoked against an ordinary commercial establishment. Nor will use of RICO/CRRA sanctions to rid that type of enterprise of illegal influence, even by closing it, engender suspicion of censorial motive. Prosecutors in such cases desire only to purge the organized-crime taint; they have no interest in deterring the sale of pizzas or hardware. Sexually explicit books and movies, however, are commodities the State does want to exterminate. The RICO/CRRA scheme promotes such extermination through elimination of the very establishments where sexually explicit speech is disseminated.

Perhaps all, or virtually all, of the protected films and publications that petitioners offer for sale are so objectionable that their sales should only be permitted in secluded areas. Cf. *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50 (1976). Many sexually explicit materials are little more than noxious appendages to a sprawling media industry. It is nevertheless true that a host of citizens desires them, that at best remote and indirect injury to third parties flows from them, and that purchasers have a constitutional right to possess them. The First Amendment thus requires the use of "sensitive tools" to regulate them. *Speiser* v. *Randall*, 357 U. S. 513, 525 (1958). Indiana's RICO/CRRA statutes arm prosecutors not with scalpels to excise obscene portions of an adult bookstore's inventory but with sickles to mow down the entire undesired use. This the First Amendment will not tolerate. " '[I]t is better to leave a few . . . noxious branches to their luxuriant growth, than, by pruning them away, to injure the vigour of those yielding the proper fruits,' " [29] for the "right to receive information and ideas,

---

[29] *Near* v. *Minnesota ex rel. Olson*, 283 U. S., at 718 (Hughes, C. J.) (quoting 4 Writings of James Madison 544 (1865)).

regardless of their social worth, is fundamental to our free society." [30]

Accordingly, I would reverse the decision in No. 87–614. In No. 87–470, I would not only invalidate the pretrial seizures but would also direct that the complaint be dismissed.

---

[30] *Stanley* v. *Georgia*, 394 U. S. 557, 564 (1969) (citation omitted).