UNITED STATES of America, Plaintiff,

v.

**Nick LOBUE and Donald Prisco, Defendants.**

**No. 90 CR 726.**

United States District Court,
N.D. Illinois, E.D.

Nov. 20, 1990.

**750**

Fred Foreman, U.S. Atty., Chris Gair, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Michael D. Monico, Barry A. Spevack, Monico, Pavich & Spevack, Chicago, Ill., for defendant Lobue.

Ann C. Tighe, Cotsirilos, Stephenson, Tighe & Streicker, Ltd., Chicago, Ill., for defendant Prisco.

## MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

Defendants Nick Lobue and Donald Prisco were indicted for criminal violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d); extortion in violation of 18 U.S.C. § 1951; and tax violations under 26 U.S.C. § 7206(1). Lobue and Prisco move to dismiss the RICO charges (counts I and II) on the ground that RICO is unconstitutionally vague. In addition, Lobue and Prisco move for a bill of particulars, for immediate disclosure of all evidence favorable to them, and for an order requiring the government to give notice of its intention to use evidence of other crimes, wrongs, or acts.

## BACKGROUND

On a pretrial motion to dismiss, the court must determine whether the allegations in the indictment are sufficient to charge an offense, regardless of the strength or weakness of the government's case. *United States v. Sampson*, 371 U.S. 75, 78–79, 83 S.Ct. 173, 174–75, 9 L.Ed.2d 136 (1962); *United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir.1988). For the purposes of Lobue and Prisco's motion to dismiss, the court accepts as true the factual allegations in the indictment.

The government bases its RICO charges in counts I and II on alleged predicate acts of extortion and bribery by Prisco and Lobue. At all times relevant to the indictment, Lobue served as finance commissioner of the City of Chicago Heights, Illinois. Lobue was primarily responsible for overseeing the city's revenues and expenses. Lobue's position entitled him to vote on all matters before the city council. Prisco was president of the Village of South Chicago Heights, Illinois. In addition to their positions in city government, Lobue and Prisco co-owned and operated the Lincolnway Currency Exchange in Chicago Heights, and the East Chicago Heights Currency Exchange in East Chicago Heights. Lobue also owned and operated the A.A. Arken Corporation ("Arken"), an exterminating

business. Much of the bribe money at issue was allegedly filtered through the two currency exchanges, and the exterminating business.

Prisco and Lobue's alleged acts of bribery and extortion center around their involvement in the City of Chicago Heights' award of contracts for garbage disposal and the operation of the city's landfill. Count I charges Lobue and Prisco with conspiring to extort money and receive bribes from the owners of a garbage collection business known as Fitzpatrick Brothers Disposal Service, Inc. ("Fitzpatrick Brothers"), and a landfill operation business called Fitz-mar, Inc. ("Fitz-mar"). In addition, Lobue and Prisco are charged with conspiracy to receive bribes from Albert Tocco, who is not named as a defendant in this case. Tocco purchased Fitzpatrick Brothers in June 1983, and renamed the business Chicago Heights Disposal. Count II charges Lobue and Prisco with actually committing the conspiratorial acts. The specific allegations regarding the garbage disposal contracts and the contract for the operation of the landfill are discussed below.

A. Fitzpatrick Brothers Garbage Disposal Business

Until June 1983, Fitzpatrick Brothers, based in Steger, Illinois, was owned by Martin and Harold Wondaal and managed by Charles Fitzpatrick. In April 1980, Prisco advised Charles Fitzpatrick that Fitzpatrick Brothers could obtain the city garbage hauling contract beginning in June 1980 by making cash payments to public officials. Martin Wondaal and Charles Fitzpatrick agreed to this arrangement. On April 22, 1980, the City of Chicago Heights awarded its garbage hauling contract to Fitzpatrick Brothers. Shortly thereafter, Martin Wondaal and Charles Fitzpatrick made a series of cash payments to Prisco and Lobue for their work in securing the garbage hauling contract.

On February 12, 1981, Fitzpatrick Brothers submitted a bid to obtain the City of Chicago Heights' contract for picking up bulk garbage items, a service not included in the original contract. Before the city council voted on the contract, Prisco promised Ernest Molyneaux, the superintendent of streets and public improvements for Chicago Heights, that Molyneaux could expect to receive $1500 if Molyneaux would support Fitzpatrick Brothers' bid. On April 27, 1981, the Chicago Heights city council voted to accept Fitzpatrick Brothers' bid. Prisco subsequently met with Molyneaux and gave him $1500.

Sometime prior to June 1983, Albert Tocco advised Martin Wondaal that Tocco would be taking over the Chicago Heights garbage hauling contract. After hearing this news, Wondaal agreed to sell Tocco the business. On June 1, 1983, Chicago Heights renewed its contract with Fitzpatrick Brothers to provide garbage disposal service for three years. Tocco purchased Fitzpatrick Brothers that same day, and renamed it Chicago Heights Disposal. On April 3, 1984, the city executed a new contract doubling the frequency of garbage collection each week, doubling the amount of compensation to Chicago Heights Disposal, and extending the term of the contract to April 1990.

On September 27, 1984, Lobue wrote a letter to Tocco suggesting that Tocco use Arken, Lobue's business, for exterminating services. No exterminating services were ever rendered. Nevertheless, between October 1, 1984 and May 28, 1987, Tocco issued monthly checks for $1800 payable to Arken on the account of Chicago Heights Disposal. Lobue frequently picked up the monthly check in person, and the check would subsequently be deposited into Arken's account. Lobue would then receive a corresponding check for approximately $1800 drawn on Arken's account. Arken recorded these checks as commissions to Lobue. Besides the monthly payments to Arken, Tocco also made monthly payments of at least $175 to Molyneaux from 1983 to 1987.

B. Landfill Contract

In the spring of 1981, the City of Chicago Heights began seeking bids for the operation of its municipal landfill. Prisco told

Charles Fitzpatrick that Martin Wondaal and Fitzpatrick could probably obtain the landfill contract, but that they would have to make payments to public officials, including Lobue. Lobue subsequently contacted Molyneaux, and promised him a reward if Fitzpatrick and Wondaal received the landfill contract. Fitzpatrick and Wondaal submitted their bid and were interviewed by a panel of four city officials, including Lobue and Molyneaux. Lobue and Molyneaux inflated their ratings of Fitzpatrick and Wondaal's bid so that their proposal received the highest average rating. Fitzpatrick and the Wondaals formed Fitz-mar Corp. ("Fitz-mar") in September of 1981, and by November, the City of Chicago Heights had entered into a contract with Fitz-mar to operate the landfill for eight years.

In early 1982, Prisco advised Martin Wondaal that Wondaal would have to make a payment to Chicago Heights officials. Prisco told Wondaal to obtain $20,000 in gold coins for the payment. Wondaal used money from Fitz-mar to purchase 50 South African Kruggerands, at a cost of $20,950. Wondaal left the Kruggerands with a Chicago Heights police officer who, at Prisco's request, had escorted Wondaal to the coin shop. Sometime thereafter, Prisco gave Charles Fitzpatrick nine Kruggerands, apparently in compensation for Fitzpatrick's role in securing the landfill contract. In addition, Lobue gave Molyneaux eleven Kruggerands.

During 1982 and 1983, Prisco received weekly checks for $500 or more from Fitz-mar. Prisco did not perform any legitimate services in exchange for those payments. In May 1983, Prisco again demanded a large payment from Martin Wondaal for city officials and suggested that the funds be generated by disguising the withdrawal as a purchase of equipment. Prisco received the payoff through Lee Wichowsky, a dealer in heavy equipment. Martin Wondaal wrote two checks on Fitz-mar's account for a total of $36,000 payable to Lee Wichowsky. Wichowsky cashed the checks and turned over a substantial portion of the proceeds to Prisco.

From 1982 through 1987, Prisco and Lobue periodically demanded and received payoffs from Fitz-mar in the form of cash, Fitz-mar stock, gold coins and checks written to fictitious payees. Molyneaux also demanded and received substantial payoffs from Martin Wondaal on behalf of Fitz-mar.

## DISCUSSION

### I. Lobue and Prisco's Motion to Dismiss

Counts I and II charge Lobue and Prisco with violating 18 U.S.C. §§ 1962(c) and (d), which provide, in relevant part:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

Lobue and Prisco move to dismiss the RICO charges on the ground that RICO is unconstitutionally vague. Specifically, they protest the broad scope of the "enterprise" and "pattern of racketeering activity" elements.

The government, relying on the Supreme Court's decision in *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 109 S.Ct. 916, 103 L.Ed.2d 34 (1989), argues that because RICO requires proof of the commission of or conspiracy to commit specified federal or state predicate offenses, RICO can only be unconstitutionally vague if the statutes prohibiting the predicate offenses are themselves vague. *Id.*, 489 U.S. at 58, 109 S.Ct. at 925. In *Fort Wayne Books*, the Court held that because Indiana's obscenity law was not unconstitutionally vague, the Indiana RICO statute that included obscenity offenses as predicate acts could not be void for vagueness. The Court suggested that the Indiana RICO statute might even be less vague than the underlying obscenity law, because in order to convict a defen-

dant under the RICO statute for obscenity offenses, the prosecution must establish a "pattern" of obscenity violations. *Id.*, 489 U.S. at 58–59 n. 7, 109 S.Ct. at 925 n. 7. In this respect, the Court noted that "a prosecution under the RICO law will be possible only where all the elements of an obscenity offense are present, *and then some.*" *Id.* (emphasis added).

While the government's interpretation of *Fort Wayne Books* is correct, the case is not dispositive of Lobue and Prisco's vagueness challenge. Unlike the petitioner in *Fort Wayne Books*, Lobue and Prisco do not challenge RICO's application to the predicate acts of bribery and extortion. Instead, Lobue and Prisco focus on the enterprise and pattern elements of RICO. Lobue and Prisco take issue with the "and then some" language of *Fort Wayne Books.* Lobue and Prisco assert that RICO's standard for determining a pattern of racketeering activity is unconstitutionally vague; hence the pattern element does not render RICO less vague than the statutes governing the underlying predicate offenses. Lobue and Prisco also claim that the enterprise element is too vague to withstand constitutional muster. Because Lobue and Prisco's vagueness challenge requires a different inquiry than the issue in *Fort Wayne Books*, the court cannot rely on that case in analyzing Lobue and Prisco's challenge. *See United States v. Pungitore*, 910 F.2d 1084, 1103 n. 15 (3d Cir. 1990) (rejecting government's contention that *Fort Wayne Books* controls vagueness challenge to RICO's pattern element).

A. The Pattern Element

RICO scarcely defines the pattern element. At the bare minimum, a " 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). This meager definition has led to confusion and discrepancy among circuits regarding the scope and meaning of the pattern element.

The Supreme Court recently grappled with the meaning of "pattern of racketeering activity" in *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). After expressing despair over Congress' failure to provide guidance on this key RICO element, the Court undertook to clarify the pattern element. *Id.* at 2899. According to the Court, Congress intended the pattern element to require "a plaintiff or prosecutor [to] show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* at 2900 (emphasis in original). Predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 2901. The continuity requirement may be met by either (1) showing a series of related predicate acts extending over a substantial period of time, or (2) establishing the threat of continued racketeering activity. *Id.* at 2902. One way of proving a continued threat is to show that the predicates are a regular way of conducting the defendants' ongoing legitimate business. *Id.*

The *H.J.* Court recognized that the scope of the relationship and continuity requirements, and the methods of proving them, "cannot be fixed in advance with such clarity that it will always be apparent whether in a particular case a 'pattern of racketeering activity' exists." *Id.* By this statement, the Court suggested that the determination whether a pattern exists remains a case-by-case inquiry involving many factors.

In his concurring opinion, Justice Scalia, joined by three other Justices, opined that the *H.J.* Court's definition of a pattern of racketeering activity fell far short of clarifying the pattern element. Although the issue of vagueness was not before the Court, Justice Scalia's inability to provide a viable alternative definition led him to conclude that the *H.J.* decision "bodes ill for the day" when a vagueness challenge to RICO is presented to the Supreme Court. *Id.* at 2909. Defendants Lobue and Prisco

now challenge the pattern element on vagueness grounds, citing the *H.J.* concurrence as an open invitation to do so.

A penal statute is void for vagueness if it (1) does not "define the criminal offense with sufficient definiteness so that ordinary people can understand what conduct is prohibited" or (2) is defined in a manner that encourages arbitrary and discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *Server v. Mizell*, 902 F.2d 611, 613 (7th Cir.1990). Absent First Amendment considerations, vagueness challenges must be examined in light of the statute's application to the defendant in the particular case. *New York v. Ferber*, 458 U.S. 747, 767, 102 S.Ct. 3348, 3359–60, 73 L.Ed.2d 1113 (1982); *United States v. Powell*, 423 U.S. 87, 93, 96 S.Ct. 316, 320, 46 L.Ed.2d 228 (1975); *United States v. Angiulo*, 897 F.2d 1169, 1179 (1st Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 1130, 112 L.Ed.2d 98 (1990); *United States v. Pungitore*, 910 F.2d 1084, 1104 (3d Cir. 1990). Thus, in the present case, the court must consider whether RICO's definition of "pattern of racketeering activity" is sufficient to give ordinary persons in Lobue and Prisco's situation fair notice that their alleged acts of extortion and bribery constitute an unlawful "pattern of racketeering activity" accomplished through their positions as public officials. The court need not further consider whether the pattern requirement would be unconstitutionally vague if applied to other persons in marginal fact situations not at issue here. *See Pungitore*, 910 F.2d at 1104 (appellants lacked standing to challenge RICO's application to hypothetical conduct of third parties on vagueness grounds). *Accord Angiulo*, 897 F.2d at 1179.

There is no vagueness problem in applying the *H.J.* standard to Lobue and Prisco's alleged acts of bribery and extortion. Their allegedly corrupt conduct clearly satisfies the relationship and continuity test articulated in *H.J.* The government alleges that by using their power and influence as public officials, Lobue and Prisco were able to extort thousands of dollars from Fitzpatrick Brothers and Fitz-mar. Defendants also regularly bribed another city council member, Ernest Molyneaux, to further their criminal scheme. Because the alleged acts of bribery and extortion were so clearly part of defendants' scheme to illegally profit from their positions as public officials, the predicate acts could not possibly be unrelated. In addition, defendants' alleged conduct satisfies the continuity factor, for the related predicate acts occurred regularly over a period of six years.

In sum, Lobue and Prisco rely solely on Justice Scalia's concurrence to support their claim that the pattern element is void for vagueness. They fail to argue that the pattern element is vague as applied to their own alleged misconduct. They do not contend that the pattern element is so vague that ordinary persons would be unaware that the bribery and extortion alleged here constituted a pattern under RICO. Nor do they suggest that their indictment resulted from arbitrary enforcement or interpretation of the pattern element of RICO. Indeed, defendants' alleged acts seem to form the classic pattern of racketeering activity.

RICO's application to certain cases may exceed the boundaries of its legislative purpose. That is not the case here. RICO's "pattern of racketeering activity" is not unconstitutionally vague as applied to Lobue and Prisco.

### B. The Enterprise Element

Lobue and Prisco argue that RICO's definition of the "enterprise" requirement is unconstitutionally vague because it is so broad that it encourages discriminatory RICO enforcement by police and prosecutors. *Kolender*, 461 U.S. at 357–58, 103 S.Ct. at 1858. Under 18 U.S.C. § 1961(4), the term "enterprise" may include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Lobue and Prisco contend that the elasticity of the enterprise concept enables the government to draft RICO indictments as broad or as

narrow as it sees fit. According to Lobue and Prisco, the government chose the City of Chicago Heights as the enterprise because Chicago Heights encompasses all of the acts allegedly committed by Lobue and Prisco. But if the government had wished to include additional acts or defendants in the alleged conspiracy, the indictment could have been redrafted with an enterprise defined as an "association-in-fact" or, perhaps, a broader entity encompassing Chicago Heights, like Cook County. Defendants maintain that the enterprise element unconstitutionally allows the government to arbitrarily sweep several defendants into a single RICO indictment by simply defining the enterprise broadly enough to include every defendant.

To support their contention, defendants cite *United States v. Stratton,* 649 F.2d 1066 (5th Cir.1981). In that case, four defendants, including a state judge and his bailiff, appealed their RICO conviction for engaging in "a pattern of racketeering activity involving the court and law enforcement system of the Third Judicial Circuit of the State of Florida." *Id.* at 1070. On appeal, the defendants argued that the government's use of the Third Judicial Circuit as the RICO enterprise rendered the indictment unconstitutionally vague. In a footnote, the *Stratton* court acknowledged that in certain hypothetical situations, the flexible nature of the enterprise element might be abused, and the government could combine totally unrelated agreements and overt acts by choosing an overly broad enterprise. *Id.* at 1073 n. 8. However, Lobue and Prisco's brief fails to mention that in virtually the same breath, the *Stratton* court recognized that the case before it presented no such problem, because the "agreements alleged in the indictment [we]re sufficiently connected to constitute a single RICO conspiracy." *Id.*

The *Stratton* opinion offers no help to Lobue and Prisco. The government correctly points out that the hypothetical situation referred to in *Stratton* bears little similarity to the present case. The government chose the City of Chicago Heights as the RICO enterprise because Lobue and Prisco used their association with this entity to further their alleged racketeering scheme. Lobue and Prisco cannot successfully challenge RICO's enterprise element by showing that in hypothetical situations, the government might choose an entity that would render application of RICO's enterprise element unconstitutionally vague. *See Ferber, supra.* In the present case, the government's choice of the City of Chicago Heights was not inappropriate in light of the specific allegations in the indictment.[1]

Defendants also object to the enterprise element on the ground that it enables prosecutors to avoid the protections afforded under the double jeopardy clause. *See, e.g., United States v. Langella,* 804 F.2d 185, 189 (2d Cir.1986) (no double jeopardy problem unless "both the enterprise and the pattern of activity alleged in the earlier indictment [are] the same as those alleged in the second indictment"), citing *United States v. Russotti,* 717 F.2d 27, 33 (2d Cir.1983). Again, Lobue and Prisco are not now facing a potential double jeopardy situation. Neither defendant has been previously convicted of any underlying offenses. Thus, Lobue and Prisco lack standing to challenge the enterprise element on double jeopardy grounds.

This court recognizes the elusiveness of the "enterprise" and "pattern of racketeering" concepts. Nevertheless, in this case defendants have not shown that these elements are unconstitutionally vague as applied to them. Accordingly, Lobue and Prisco's motion to dismiss is denied.

---

1. The government points out that the Seventh Circuit considered and rejected a vagueness challenge to the enterprise element in *United States v. Aleman,* 609 F.2d 298, 305 (7th Cir. 1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980) ("[t]hat the phrase 'any enterprise' is broad in scope, does not mean that

because it includes both legitimate and illegitimate enterprises instead of only one or the other that it is therefore vague"). *Aleman* is not precisely on point, because defendants in the present case base their vagueness challenge to the enterprise element on a different theory than the one raised in *Aleman.*

## II. Motion for a Bill of Particulars

■ Pursuant to Fed.R.Crim.P. 7(f), Lobue and Prisco request a bill of particulars setting forth additional information regarding the extortion and bribery charges. A trial judge has discretion to grant or deny a request for a bill of particulars. *United States v. Kendall*, 665 F.2d 126, 134 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982); *United States v. Cole*, 707 F.Supp. 999, 1001 (N.D. Ill.1989). A bill of particulars is not necessary if the indictment sets forth the elements of the offense charged and sufficiently apprises the defendant of the charges so that the defendant may prepare for trial. *Kendall*, 665 F.2d at 134; *United States v. Finley*, 705 F.Supp. 1272, 1278 (N.D.Ill.1988). Although a defendant is entitled to know the facts upon which the charge is based, Rule 7(f) does not enable a defendant to demand the details of how the offense will be proved. *Kendall*, 665 F.2d at 135. "Evidentiary details exceed the proper scope of a bill of particulars." *United States v. McDonnell*, 696 F.Supp. 356, 362 (N.D.Ill.1988).

■ Most of Lobue and Prisco's requests seek the names of unindicted co-conspirators and other public officials for whom Lobue and Prisco allegedly demanded payoffs. According to the government, the names of these persons were excluded from the indictment to protect their reputations. The indictment names Tocco and Molyneaux because these men have already been charged with racketeering activity, and because Tocco and Molyneaux played central roles in the alleged conspiracy with Lobue and Prisco. Defendants do not need the names of other unindicted persons to understand the nature of the extortion and bribery charges against them. The indictment describes, in considerable detail, numerous occasions on which Lobue and Prisco allegedly demanded and received payments in return for their help in securing government contracts for Fitzpatrick Brothers, Chicago Heights Disposal and Fitz–Mar. This is sufficient to inform Lobue and Prisco of the elements of the offenses charged. Accordingly, requests 1(a) and (b), 2(a), 3(a), 4(a), 6(a), 7(a), 8(a), 10(a), and 11(a) and (b) are denied.

In a closely related request, Lobue and Prisco seek the names of the city commissioner and city engineer who, along with Lobue and Molyneaux, allegedly interviewed companies bidding for the landfill contract. In addition, defendants want the government to identify other companies that submitted bids. The names of these entities are not necessary to apprise Lobue and Prisco of the charges against them. In any event, the government asserts that the names of these individuals have already been turned over to defendants in discovery documents. Therefore, requests 5(a) and (b) are denied.

■ Defendants also request information regarding the place where alleged conversations occurred, and the names of any persons who were present during the conversations. Requests for a list of witnesses or other evidentiary details as to when and where conversations took place are not within the scope of a bill of particulars. Requests 4(b), 6(b), 8(b) and 10(b) are denied. Similarly, requests for further specification regarding the amounts of money obtained and/or kept by Lobue and Prisco constitute requests for evidentiary detail. Accordingly, 9(a) and (b), 11(c) and 12(a) are denied.

The remaining requests ask the government to explain paragraph 11 of count I, which alleges that Lobue and Prisco and "their co-conspirators, including Ernest Molyneaux and Albert Tocco ..." misrepresented and concealed the purposes and acts done in furtherance of the conspiracy. In particular, defendants ask the government to specify—in terms of time, place and persons present—the acts that misrepresented and concealed the conspiracy. The government maintains that virtually every action taken by Lobue and Prisco constituted concealment and commission of the crimes charged. To the extent this is true, the indictment sufficiently describes the alleged conduct of Lobue and Prisco. Insofar as the requests seek further information, they must be denied as a demand for evidentiary matter not proper on a motion

for a bill of particulars. Defendants' requests 3(b) and (c) are denied.

Because none of Lobue and Prisco's requests have merit, defendants' motion for a bill of particulars is denied.

### III. *Motion for Disclosure of "Other Act" Evidence*

Pursuant to Fed.R.Crim.P. 12(d)(2), Lobue and Prisco move for an order directing the government to give notice if it intends to use evidence of defendants' past commission of other crimes, wrongs or acts for any purpose at trial. Lobue and Prisco further request that the government submit such notice under seal. Rule 12(d)(2) states that:

> At the arraignment or as soon thereafter as is practicable the defendant may, in order to afford an opportunity to move to suppress evidence ... request notice of the government's intention to use (in its evidence in chief at trial) any evidence which the defendant may be entitled to discover under Rule 16....

Rule 12(d)(2) authorizes Lobue and Prisco's request insofar as it seeks notice of the government's intent to use evidence of "other acts" in its case in chief.

■■■ The Federal Rules of Evidence prohibit the use of other crimes, wrongs, or acts to prove the character of a person in order to show action in conformity therewith. Fed.R.Evid. 404(b). However, evidence of "other acts" may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.* If "other act" evidence is offered for a permissible purpose, the court must then determine whether the danger of undue prejudice outweighs the probative value of the evidence. Fed.R.Evid. 403. The government represents that it will notify the court and defendants if it intends to use "other acts" evidence in its case in chief on January 10, 1991, the date set for the submission of motions *in limine.* However, in order to give defendants a fair opportunity to frame their arguments for suppression of "other act" evidence *in limine,* defendants must have notice of the government's intention to use such evidence prior to January 10. Accordingly, the government shall provide notice to Lobue, Prisco and the court of its intention to use evidence of other crimes, wrongs or acts in its case in chief by December 20, 1990.

The government contests defendants' request for notice of its intention to use "other acts" evidence on cross-examination or in its rebuttal case. The government points out that Fed.R.Crim.P. 12(d)(2) only mandates pretrial disclosure of other act evidence if the government plans to offer such evidence in its case in chief. Several cases in this district have held that the government need not disclose evidence of past crimes or misconduct that it intends to use on cross-examination or in its rebuttal case. *United States v. Santillanes,* 728 F.Supp. 1358, 1360 (N.D.Ill.1990); *Cole,* 707 F.Supp. at 1004; *United States v. Marquez,* 686 F.Supp. 1354, 1358–59 (N.D.Ill. 1988).

■■■ Rules 12(d)(2) and 16 of the Federal Rules of Criminal Procedure do not compel the government to disclose other act evidence intended for cross-examination or rebuttal. However, other act evidence must be scrutinized under Fed.R.Evid. 403 before it may be used at trial. The government may not offer other act evidence for impeachment purposes or in its rebuttal case unless the court first determines whether the probative value of the evidence outweighs the danger of undue prejudice to defendants. *See United States v. DeGeratto,* 876 F.2d 576, 582–84 (7th Cir. 1989) (where government used highly prejudicial evidence containing only slight probative value to impeach defendant under Fed.R.Evid. 608(b), trial court committed reversible error in failing to exclude the evidence under Rule 403). This determination must be made outside the jury's presence. Conducting Rule 403 arguments at sidebar would be impractical and would not be conducive to a fair and orderly trial. Accordingly, the government shall not offer other act evidence during cross-examination or in its rebuttal case unless defendants first have an adequate opportunity to object and the court has an adequate opportunity to evaluate the proffered evidence under Rule 403.

Lobue and Prisco's request for notice of the government's intent to use other act evidence is granted. The government shall file notice by December 20, 1990. Notice need not be filed under seal, as Lobue and Prisco have not shown why the government should be required to do so.

IV. *Motion for Immediate Disclosure of Exculpatory or Impeaching Evidence*

■ The government must disclose any evidence favorable to a defendant if the evidence is material to either guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The *Brady* obligation extends to evidence that tends to impeach a government witness' credibility, so long as this evidence is material to the outcome of the trial. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); *Barkauskas v. Lane*, 878 F.2d 1031, 1033 (7th Cir.1989). Evidence is "material" if there is a reasonable probability that its disclosure would change the outcome of the trial. *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383.

The government has informed defendants that it will immediately produce any *Brady* material it discovers. The government maintains that it will provide *Giglio* impeachment evidence before trial. However, the government contends that it has no duty to produce any impeachment evidence immediately upon defendants' request. Further, the government contends that of the twelve items requested by defendants, some are overbroad, and others are beyond the scope of *Brady* and its progeny.

A. The Scope of *Brady* Disclosure

■ ·In particular, the government objects to defendants' requests for the name, address and report of any interview of any person "whose testimony would be favorable to the defendants in any way," or "any evidence or information which contradicts or is inconsistent with the expected testimony of any witness for the govern-

ment." Motion ¶¶ 1, 3. The government is correct; it is only obligated to turn over favorable evidence that is material to Lobue and Prisco's guilt or punishment. Thus, general requests for "any favorable evidence" are too broad. The government also takes issue with defendants' request for the tax returns of Molyneaux, Martin and Harold Wondaal, Charles Fitzpatrick and Albert Tocco for the years 1982–1987. Defendants made this request as part of their general demand for "evidence or information which reflects adversely on the credibility of any witness the government intends to call at trial." Motion ¶ 4. Again, if the government intends to call the foregoing persons as witnesses, and if their tax returns would impeach these witnesses' testimony or would materially affect their credibility, then the government must turn over the tax returns. Otherwise, the government need not turn these documents over. *See, e.g., United States v. Andrus*, 775 F.2d 825, 843 (7th Cir.1985) (the speculative assertion that impeaching material may be in a government file did not warrant an order to disclose the contents of the file or to produce the file for the court's inspection).

B. When the Government Must Disclose Impeachment Evidence

■ The government asserts that it need not comply with defendants' request for *Giglio* impeachment evidence at this juncture; it contends that disclosure any time before trial is sufficient. Further, the government maintains that it should not be required to disclose impeachment evidence now because disclosure would give defendants advance knowledge of the government's witness list. *See United States v. Bouye*, 688 F.2d 471, 473–74 (7th Cir.1982) ("a defendant in a noncapital case [is not] entitled to lists of prospective government witnesses"). *Accord, United States v. Bailey*, 689 F.Supp. 1463, 1471 (N.D.Ill. 1987).

If the government discloses impeachment evidence before trial, it has met its *Brady* obligation so long as the defendants receive a fair trial. *See Kompare v. Stein*, 801 F.2d 883, 890 (7th Cir.1986) (disclosure of *Brady* information "need not be made until

trial as long as the defendant is not prevented from having a fair trial"). The government has represented that it will provide all material impeachment evidence to defense counsel prior to trial. In order to ensure a fair and orderly trial, the court requests that the government disclose any impeachment material at least one week prior to trial. Under these circumstances, Lobue and Prisco's request for immediate disclosure of *Giglio* impeachment evidence is denied.

## CONCLUSION

Lobue and Prisco's motion to dismiss counts I and II is denied. Their motion for a bill of particulars is also denied. Lobue and Prisco's request for disclosure of the government's intent to use "other act" evidence is granted. The government shall provide notice by December 20, 1990. Lobue and Prisco's motion for immediate disclosure of all exculpatory and impeachment evidence is granted in part and denied in part. The government shall immediately disclose any exculpatory evidence to defendants, and shall be under a continuous obligation to do so. The government is requested to disclose all *Giglio* impeachment evidence at least one week prior to trial.