**UNITED STATES of America, Plaintiff,**

v.

**Carlos QUINTANILLA, Joseph Monreal, and Leticia Gutierrez, Defendants.**

**No. 90 CR 772.**

United States District Court,
N.D. Illinois, E.D.

March 4, 1991.

Nunc Pro Tunc Feb. 7, 1991.

Fred Foreman, U.S. Atty., Scott T. Mendeloff, Bradley E. Lerman, Asst. U.S. Attys., Chicago, Ill., for plaintiff.

Nan R. Nolan, Chicago, Ill., for defendant Quintanilla.

Jo–Anne F. Wolfson, Chicago, Ill., for defendant Gutierrez.

Gerald P. Boyle, S.C., Thomas Wilmouth, Milwaukee, Wis., for defendant Monreal.

## AMENDED MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

Stripped of pleading intricacies, this case basically involves an alleged scheme by a former G. Heileman Brewing Company employee and two other persons to defraud

the company of over $700,000. In a forty-count "First Superseding Indictment" ("the indictment"), defendants Carlos Quintanilla, Joseph Monreal and Leticia Gutierrez are charged with a barrage of offenses arising from essentially the same alleged course of conduct, including violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); mail and wire fraud; transporting stolen property in interstate commerce; conspiracy to defraud the Internal Revenue Service; money laundering; and theft or embezzlement from federal employment and training funds. Quintanilla moves to dismiss Count One of the indictment.[1] In a separate motion, Gutierrez moves to dismiss the entire indictment. In addition, Gutierrez requests a *Kastigar* hearing.

## BACKGROUND

### I. *Facts Pertinent to Count One of the Indictment*

 On a pretrial motion to dismiss, the court must determine whether the allegations in the indictment are sufficient to charge an offense, regardless of the strength or weakness of the government's case. *United States v. Sampson*, 371 U.S. 75, 78–79, 83 S.Ct. 173, 175, 9 L.Ed.2d 136 (1962); *United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir.1988). For purposes of the motions to dismiss, the court accepts as true the factual allegations in the indictment.

The G. Heileman Brewing Company, Inc. ("Heileman") brews, markets and sells alcoholic beverages. Heileman hired Monreal as a sales representative in April 1983; Monreal was promoted to Director of Hispanic Market Development in September 1984. As part of its marketing efforts, Heileman awarded sponsorship funds to various community group programs in areas that included Chicago and Milwaukee. *Id.* In order to receive Heileman's fund-

ing, the community groups were required to submit proposals detailing the program to be funded, the amount of money needed, and the way in which the money would be spent. It was Monreal's job to screen each particular funding request and make preliminary recommendations as to whether Heileman should award the funds requested by the community group.

One such community group was Operation Search, an Illinois not-for-profit organization. Operation Search's articles of incorporation stated that it was organized:

> to encourage, promote, and advance charitable and civic activity by providing meaningful and effective employment services to low and moderate income residents residing primarily in the Westtown and Humboldt Park communities of Chicago....

Indictment Count One, ¶ 1(A). At all relevant times, Quintanilla served as executive director of Operation Search. Quintanilla controlled all aspects of Operation Search, including the organization's financial dealings.

The indictment alleges that beginning in September 1983 and continuing through July 1987, Quintanilla, Monreal and Gutierrez[2] conspired in a scheme to defraud Heileman of substantial sums of money earmarked for Heileman's sponsorship of community programs. According to the indictment, the defendants accomplished their scheme by submitting to Heileman several false and inflated funding requests on behalf of Operation Search. Each time Heileman awarded funds to Operation Search, Monreal received all or some of the money in kickbacks. Gutierrez also is charged with receiving some of the fraudulently obtained money. The indictment additionally alleges that the three defendants conspired to submit to Heileman fraudulent

---

1. On January 8, 1991, the court granted Gutierrez' motion to adopt defendant Quintanilla's pretrial motions. Thus, the court's disposition of Quintanilla's motion applies equally to Gutierrez.

2. The indictment does not explain how Gutierrez became associated with Monreal and Quintanilla. However, Gutierrez submitted with her pretrial motions a "statement of facts" in which she states she became romantically involved with Monreal in 1983. Gutierrez' statement of facts p. 2.

funding requests on behalf of other Hispanic organizations.

In addition to the fraud perpetrated on Heileman, the indictment further alleges that Quintanilla devised a scheme to defraud the City of Chicago of federal Job Training and Partnership Act ("JTPA") funds. Quintanilla accomplished this scheme by causing Operation Search to submit false vouchers and other documentation to the Chicago office in charge of administering and distributing JTPA funds.

## II. *Gutierrez' Statement of Facts*

Gutierrez submitted a statement of facts in support of her motion to dismiss the indictment. Because the government "intentionally does not advance any additional facts either to contest the assertions Gutierrez makes or to place her representations in context," *see* Government's response at 25, the court accepts Gutierrez' representations as true for the purpose of this motion.

In 1983, Gutierrez was assistant manager and administrator of the Mexico Medical Center on West 26th Street in Chicago, and was well-respected in Chicago's Hispanic community. During 1983, Gutierrez fell in love with Monreal. Because she loved Monreal, Gutierrez "ghost-wrote" proposals that Monreal submitted to Heileman as his own work. According to Gutierrez, Monreal took advantage of Gutierrez' intellect and position in the community for nearly three years before she realized how foolish she had been to assist him in "his crimes." Gutierrez' statement of facts at 2.

In June 1986, Gutierrez revealed to Heileman's legal department that Monreal had received kickbacks from Heileman's funding program in an amount "probably totalling six figures." *Id.* at 2–3. Heileman's personnel referred Gutierrez to the Illinois Attorney General's office, where she related her information to investigators of the United States Department of Labor. Gutierrez eventually gave her story to an Assistant United States Attorney ("AUSA"). From late 1986 until May 1990, Gutierrez cooperated with AUSA Scott

Mendeloff and other AUSAs in their investigation of Monreal's conduct in securing kickbacks from Heileman's funding program. In 1987, she made monitored telephone calls to Monreal and others, and she wore a concealed electronic recording device while meeting with Monreal and other persons under investigation. Gutierrez cooperated with Mendeloff in this way despite the fact that Monreal had threatened Gutierrez and her children.

On August 17, 1987, Mendeloff issued a subpoena directing Gutierrez to appear before a federal grand jury and bring records relating to funds received from Heileman, Operation Search and Quintanilla. Before her grand jury appearance, Patrick Reilly, an attorney, telephoned Mendeloff and asked if Gutierrez would receive immunity in exchange for her past and continued cooperation with the investigation. *See* Mendeloff's notes of August 31, 1987, attached to Gutierrez' statement of facts. Mendeloff told Reilly that no immunity would be forthcoming and that the government was prepared to indict Gutierrez for her role in the kickback scheme. Mendeloff further stated that if she was convicted, the government would immunize Gutierrez to obtain her testimony against others. Reilly then asked whether the government would consider granting Gutierrez immunity if the government was able to convict "the big fish." Mendeloff informed Reilly that he could not guarantee anything, that the government "may not prosecute, but probably would have to." *Id.* Mendeloff further stated that he would inform the sentencing court of "every iota of [Gutierrez'] cooperation." *Id.*

Later in August 1987, Reilly telephoned Mendeloff and said that he had discussed the situation with Gutierrez, and that Gutierrez intended to cooperate because "she doesn't have much choice." *Id.* Mendeloff told Reilly that if the government decided to prosecute Gutierrez, Mendeloff would tell the court "in great detail every single thing she did" to cooperate. *Id.*

Gutierrez continued to cooperate with the government through May 1990. Apparently, Gutierrez believed that Mendeloff

would not (or could not) prosecute her after she faithfully and diligently worked to provide Mendeloff with the information and evidence he needed. Mendeloff, however, was careful not to promise Gutierrez anything in return for her efforts; he also periodically informed Gutierrez that she was entitled to have an attorney present when she met with Mendeloff and other AUSAs. Gutierrez apparently decided it was not necessary to be represented by an attorney in her dealings with the United States Attorney's office.

In April 1990, Mendeloff again served Gutierrez with a grand jury subpoena, this time requesting records pertaining to the Hispanic Community Center, a project Gutierrez developed beginning in August 1986. In May 1990, Gutierrez refused to read to the grand jury a statement apparently prepared by Mendeloff.

The original indictment naming Monreal and Quintanilla was returned on September 6, 1990. That indictment contained only four counts charging mail fraud and interstate transportation of funds obtained by fraud. Gutierrez was not indicted. However, on October 18, 1990, a superseding indictment was returned naming Gutierrez and charging 36 additional statutory violations for essentially the same alleged course of conduct. Three separate RICO counts were added. Monreal, the central figure in the scheme to defraud Heileman, has pleaded guilty to only two counts under an agreement with the government. Monreal has agreed to testify against Quintanilla and Gutierrez.

## DISCUSSION

### I. *Quintanilla's Motion to Dismiss Count One of the Indictment*

Count One of the indictment lumps all of the alleged wrongdoing by each defendant into a single RICO conspiracy charge under 18 U.S.C. § 1962(d).[3] The indictment states that Monreal, Quintanilla and Gutierrez conspired and agreed to conduct the "enterprise" of Operation Search through a pattern of racketeering activity. Quintanilla advances two reasons in support of his motion to dismiss: (1) the RICO statute is unconstitutionally vague; and (2) Count One impermissibly alleges multiple conspiracies.

### A. *Vagueness Challenge*

■ Quintanilla contends that RICO's "pattern" element is unconstitutionally vague. The RICO statute provides a rather scant definition of the pattern element. Under RICO, a " 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). The Supreme Court has interpreted RICO's pattern element to require a showing that the predicate racketeering acts are related, and that they amount to or pose a threat of continued criminal activity. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989). Predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* 109 S.Ct. at 2901. The continuity requirement may be met by either (1) showing a series of related predicate acts extending over a substantial period of time, or (2) establishing the threat of continued racketeering activity. *Id.* at 2902.

Justice Scalia's concurring opinion in *H.J.* suggested that the *H.J.* majority failed in its goal to provide lower courts with guidance as to what constitutes a "pattern of racketeering activity." Although the issue

---

**3.** 18 U.S.C. § 1962(d) provides "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c)."
 Subsection (c) states:
 It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 18 U.S.C. § 1962(c).

of vagueness was not before the Court, Justice Scalia's inability to provide a clearer definition of the pattern element led him to predict that a future vagueness challenge to RICO might succeed. *Id.* at 2909. Quintanilla now brings a vagueness challenge to the pattern element, relying extensively on Justice Scalia's *H.J.* concurrence.

■ A penal statute is void for vagueness if it (1) does not "define the criminal offense with sufficient definiteness so that ordinary people can understand what conduct is prohibited" or (2) is defined in a manner that encourages arbitrary and discriminatory enforcement. *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *Server v. Mizell,* 902 F.2d 611, 613 (7th Cir.1990). Absent first amendment considerations, vagueness challenges must be examined in light of the statute's application to the defendant in the particular case. *New York v. Ferber,* 458 U.S. 747, 767, 102 S.Ct. 3348, 3360, 73 L.Ed.2d 1113 (1982); *United States v. Angiulo,* 897 F.2d 1169, 1179 (1st Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990); *United States v. Pungitore,* 910 F.2d 1084, 1104 (3d Cir.), *petition for cert. filed,* (Dec. 6, 1990) (No. 90–6472); *United States v. Lobue,* 751 F.Supp. 748, 754 (N.D.Ill.1990). Thus, Quintanilla's claim that RICO is unconstitutionally vague on its face is misguided.[4] The relevant inquiry is whether RICO's pattern element is unconstitutionally vague as applied to Quintanilla's conduct.

In the present case, there is no vagueness problem in applying RICO's pattern element to Quintanilla's alleged acts of mail and wire fraud and embezzlement. Quintanilla's alleged corrupt conduct clearly satisfies the relationship and continuity test articulated in *H.J.* Quintanilla allegedly used his position as director of Operation Search to defraud Heileman and the City of Chicago on several occasions. The alleged fraudulent scheme contained similar participants (Quintanilla, Monreal and Gutierrez), victims (Heileman and the City of Chicago), method of commission (submitting inflated or false claims) and results (defrauding Heileman and the City of Chicago). In addition, the alleged predicate acts of mail and wire fraud and embezzlement occurred over a substantial period of time.

In sum, Quintanilla has not shown that the pattern element as applied to his own conduct is impermissibly vague. Indeed, an ordinary person in Quintanilla's position would surely know that continuous and related acts of mail fraud, wire fraud and embezzlement amount to a "pattern of racketeering activity." Moreover, Quintanilla does not argue that the indictment resulted from arbitrary enforcement or interpretation of the pattern element of RICO. Accordingly, the motion to dismiss Count One on vagueness grounds is denied.

### B. *Multiple Conspiracies in Count One*

Quintanilla objects to the government's use of Count One to conglomerate all the substantive and conspiracy offenses contained in Counts Two through Forty into a single charge against all three defendants for conspiracy to violate RICO. Quintanilla's argument contains two components. First, Quintanilla argues that Count One must be dismissed for failure to allege a single RICO conspiracy. Second, Quintanilla argues that defendants would suffer unfair prejudice by the "spillover from evidence relating solely to other defendants or by a transference of guilt from one defendant to another." Quintanilla's motion at 3.

#### 1. *Allegation of a Single RICO Conspiracy*

■ As stated previously, Count One charges the three defendants with conspiring to conduct the activities of Operation Search through a pattern of racketeering

---

**4.** Indeed, the Seventh Circuit recently rejected a facial challenge to the constitutionality of RICO: We also join the First and Third Circuits in reaffirming that the RICO statute is not unconstitutional despite Justice Scalia's state-

ments concerning the pattern requirement in his concurrence in [*H.J.*].
*United States v. Glecier.* 923 F.2d 496, 497 n. 1 (7th Cir.1991), citing *Pungitore,* 910 F.2d at 1102–05; and *Angiulo,* 897 F.2d at 1179–80.

activity. The "pattern of racketeering activity" referred to in Count One essentially consists of all of the substantive and conspiracy offenses charged in the rest of the forty-count indictment. Indeed, Count One expressly incorporates by reference several different alleged fraudulent schemes committed by some or all of the three defendants in various combinations. Quite understandably, Quintanilla expresses concern over the breadth of this RICO conspiracy charge, which encompasses multiple fraudulent schemes. In particular, Quintanilla contends that Count One is defective because the combination of multiple conspiracies alleged do not constitute a RICO conspiracy.

The seminal Seventh Circuit case regarding the scope of RICO conspiracy allegations is *United States v. Neapolitan*, 791 F.2d 489 (7th Cir.) *cert. denied*, 479 U.S. 940, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986). The *Neapolitan* court determined that "a RICO conspiracy requires only an agreement to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity." *Id.* at 498. In the present case, Count One clearly satisfies *Neapolitan's* lenient standard, for it alleges that Gutierrez, Quintanilla and Monreal agreed to conduct the enterprise of Operation Search through the commission of multiple acts of racketeering activity.

*Neapolitan* also forecloses Quintanilla's argument that Count One improperly uses separate conspiracies as predicate acts for the § 1962(d) conspiracy:

> [t]his section of RICO is capable of providing for the linkage in one proceeding of a number of otherwise distinct crimes and/or *conspiracies* through the concept of enterprise conspiracy. The government, through the vehicle of the indictment, provides the linking conspiratorial objective of a specific RICO violation.

*Id.* at 501 (emphasis added), citing *United States v. Sutherland*, 656 F.2d 1181, 1191–93 (5th Cir.1981), *cert. denied*, 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982). *See also United States v. Walters*, 711 F.Supp. 1435, 1447 (N.D.Ill.1989) (several different conspiracies may serve as predicate acts for § 1962(d) conspiracy). Under *Neapolitan*, the § 1962(d) conspiracy in Count One is sufficient so long as the government alleges an agreement among the three defendants to conduct Operation Search through a pattern of racketeering activity. The government has satisfied this requirement by alleging numerous instances where the three defendants cooperated in defrauding Heileman through the vehicle of Operation Search.

### 2. *Prejudicial Effects*

Quintanilla's motion to dismiss Count One raises the issue of potential prejudice to the defendants by introducing evidence at trial of multiple conspiracies involving various combinations of the three defendants. This issue is best addressed in a motion for severance. Fed.R.Crim.P. 8. Indeed, Quintanilla and Gutierrez have filed a motion to sever Counts 27 through 40 based on the potential prejudice of introducing evidence of fraudulent activity that Quintanilla allegedly committed solely on his own behalf without the cooperation of Monreal or Gutierrez. Accordingly, the court shall address Quintanilla's arguments regarding the potential prejudice of "spillover" evidence upon disposition of the severance motion.

### II. *Gutierrez' Motion to Dismiss the Indictment and for a Kastigar Hearing*

■ Although Gutierrez did not receive immunity in exchange for her grand jury testimony, she argues that under the circumstances of this case, her testimony before the grand jury should be considered immunized. On this basis, Gutierrez moves to dismiss the charges against her pursuant to the federal use immunity statute, 18 U.S.C. § 6002. In the alternative, Gutierrez requests a hearing to determine whether the indictment had been tainted by the improper use of her "immunized" testimony.

■ When a witness is given immunity under the federal use immunity statute in exchange for testimony before the grand jury,

[N]o testimony or other information compelled under the order [granting immunity] (or any information directly or indirectly derived from such testimony or information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order [granting immunity].

18 U.S.C. § 6002. If the government proceeds to prosecute a previously immunized witness, the government has "the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Kastigar v. United States,* 406 U.S. 441, 460, 92 S.Ct. 1653, 1664, 32 L.Ed.2d 212 (1972). In such a situation, a trial court ordinarily must conduct a hearing (a *"Kastigar* hearing") to determine whether the government had a wholly independent source for the evidence upon which the indictment was returned. *United States v. North,* 920 F.2d 940, 942 (D.C. Cir.1990).

Gutierrez invokes *Kastigar* and its progeny in arguing that the indictment must be dismissed. However, all of the cases cited by Gutierrez involved witnesses who had been indicted after providing *immunized* testimony.[5] It is undisputed that Gutierrez testified before the grand jury without a grant of immunity. Indeed, before Gutierrez testified, Mendeloff informed an attorney who purportedly represented Gutierrez that she would *not* receive immunity in exchange for her testimony. In spite of this fact, Gutierrez decided to testify before the grand jury in hope that her cooperation would result in a decision not to prosecute her for her role in the alleged scheme.[6] Gutierrez asks the court to infer immunity from her relationship with Mendeloff and her subjective belief that she would not be prosecuted. But, as the Supreme Court stated:

[n]o court has authority to immunize a witness. That responsibility, as we have noted, is peculiarly an executive one, and only the Attorney General or a designated officer of the Department of Justice has authority to grant use immunity.

*Pillsbury Co. v. Conboy,* 459 U.S. 248, 255, 103 S.Ct. 608, 613, 74 L.Ed.2d 430 (1983). Moreover, the Supreme Court has refused to allow federal courts to impose "constructive use immunity," in which courts could prevent the government from using incriminatory statements against a person claiming the privilege against self-incrimination even though the statutory procedures have not been followed. *United States v. Doe,* 465 U.S. 605, 616, 104 S.Ct. 1237, 1244, 79 L.Ed.2d 552 (1984). The *Doe* holding was based upon the principle that Congress expressly left the decision to grant use immunity to the executive branch. *Id.* at 616–17, 104 S.Ct. at 1244. Accordingly, the court lacks jurisdiction to infer that Gutierrez is entitled to immunity based on her testimony to the grand jury. Furthermore, no *Kastigar* hearing is necessary because Gutierrez has not shown that the indictment is based on immunized testimony. *See Kastigar,* 406 U.S. at 461–62, 92 S.Ct. at 1665 ("[o]ne raising a claim under this statute need only show that he testified under a grant of immunity in order to shift to the government the heavy burden of proving that all of the evidence it proposes to use

---

**5.** *United States v. North,* 910 F.2d 843 (D.C.Cir. 1990); *United States v. Hampton,* 775 F.2d 1479 (11th Cir.1985) (where federal authorities used witness' state-immunized testimony to build case against him, indictment should have been dismissed); *United States v. Hinton,* 543 F.2d 1002 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976) (government may not use same grand jury that heard witness' immunized testimony to indict witness for participation in the matters being studied by the grand jury).

**6.** Based upon Mendeloff's conduct and ambiguous statements, Gutierrez reasonably may have believed that she might avoid prosecution by cooperating. Although Mendeloff never promised Gutierrez that she would be immune from prosecution, he also did not clearly inform her that she would be prosecuted and that the information she provided could be used against her. Instead, Mendeloff told Reilly that "the United States Attorney's Office may not prosecute Gutierrez, but probably would have to." Government's response at 26. It may reasonably be inferred that had Gutierrez been clearly informed she would be prosecuted, she would not have continued to assist the government in compiling incriminating evidence against her for three years.

was derived from legitimate independent sources").

In sum, Gutierrez' objections to the charges brought against her do not require dismissal of the indictment based on *Kastigar*. Her motion is premised on essential notions of fairness and an implied abuse of prosecutorial discretion. After providing the information that initiated the government's investigation of this case and after actively cooperating with the government for three years, Gutierrez now faces an extraordinary number of serious federal offenses carrying substantial penalties. However, the anomaly of Gutierrez' position does not warrant dismissal of the indictment on *Kastigar* grounds. Gutierrez has not demonstrated that she testified before the grand jury under a grant of statutory use immunity. Therefore, her motion to dismiss based on *Kastigar* and its progeny is denied. Gutierrez' motion for a *Kastigar* hearing is also denied.

### III. *Motion for Disclosure of Exculpatory Evidence*

■■■■ The government must disclose any evidence favorable to a defendant if the evidence is material to either guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The *Brady* obligation extends to evidence that tends to impeach a government witness' credibility, so long as this evidence is material to the outcome of the trial. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); *Barkauskas v. Lane*, 878 F.2d 1031, 1033 (7th Cir.1989). Evidence is "material" if there is a reasonable probability that its disclosure would change the outcome of the trial. *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383.

The government has represented to Quintanilla that as soon as the government becomes aware of any *Brady* or *Giglio* material, it will disclose such information promptly. However, because the parties disagree as to the scope of the government's *Brady* obligations, Quintanilla filed a motion for disclosure of various items that Quintanilla believes to be covered by *Brady* and *Giglio*. The motion contains nine categories of information sought by Quintanilla. The government has agreed to disclose—or has already disclosed—the information in categories 1, 3, 4 (except for request 4(a)(5)), 5, 7, and 9. Thus, as to these categories, Quintanilla's motion is denied as moot. The court now addresses the information sought in categories 2, 6, 8 and 4(a)(5).

### A. *Other Misconduct or Bad Acts*

■■■ Category 2 of Quintanilla's motion lists three types of information. First, Quintanilla requests any information regarding government witnesses' bad acts or misconduct. The government does not dispute that this information would be useful for impeachment. Accordingly, request 2(a) is granted. In request 2(b), Quintanilla seeks the following information for any government witness: "[a]ny and all IRS investigative case files, including, but not limited to, interviews, documents, financial and tax analyses, and special agents' reports." Quintanilla's Motion ¶ 2(b). Apparently, the government has already produced such information to Quintanilla. Government's Response at 3. Thus, request 2(b) is denied as moot.

■■■ The government objects, however, to request 2(c), which demands disclosure of "[a]ny and all agency investigative files of the FBI or any other federal or state agency, including ... [information regarding] any investigation for bribery, extortion, RICO, fraud, corruption, or any other offense, for any person who will be a witness for the government." Quintanilla's Motion ¶ 2(c). The government asserts that by this request, Quintanilla seeks to engage in "a baseless fishing expedition into the government files." Government's Response at 3. Clearly, *Brady* does not authorize a defendant to peruse government files in the hope of finding potentially exculpatory evidence. *See United States v. Navarro*, 737 F.2d 625, 630–31 (7th Cir.), *cert. denied*, 469 U.S. 1020, 105 S.Ct. 438, 83 L.Ed.2d 364 (1984) (speculative assertion

that impeaching material may be in a government file did not warrant order to disclose file's contents); *United States v. McDonnell*, 696 F.Supp. 356, 363–64 (N.D. Ill.1988) ("[g]overnment need not produce raw investigative files on its witnesses from [various state and federal agencies]"). Thus, the government need not disclose entire federal and state agency files on its witnesses. Nevertheless, to the extent that these files contain material information tending to impeach government witnesses, *Brady* and *Giglio* require disclosure. The government has represented that all impeachment material will be turned over 10 days in advance of trial. Government's response at 6. So long as the government complies with its representation in accordance with the foregoing principles, Quintanilla's request 2(c) is moot. Accordingly, requests 2(b) and (c) are denied.

### B. *Personnel and Other Files*

 Under this heading, Quintanilla makes a general request for "all personnel files for the [government] witness; the existence and identity of all federal, state and local government files for the [government] witness ..." Quintanilla's motion ¶ 6. This broad request for any file pertaining to a government witness is beyond the scope of *Brady*. Quintanilla is not entitled to this information without advancing some reason for believing that these files contain impeaching material. *See United States v. Andrus*, 775 F.2d 825, 843 (7th Cir.1985) (defendant not entitled to personnel files of law enforcement witnesses "without even a hint that impeaching material was contained therein"). *See also United States v. Phillips*, 854 F.2d 273, 277 (7th Cir.1988) ("*Brady* does not grant criminal defendants unfettered access to government files").

In the remainder of category six, Quintanilla seeks disclosure of "the existence and identity of all internal affairs, internal investigation or public integrity investigation files concerning the witness," and any information regarding investigation or allegations of a witness' misconduct. Quintanilla's motion ¶ 6. The government does not

object to this request. To the extent this information might be material for impeachment purposes, the government must disclose it.

### C. *Exculpatory Statements of Other Persons*

 The government objects to several aspects of category eight. Paragraph 8(d) requests disclosure of "[a]ny persons known to the government who have some knowledge about this case, but who will *not* be called to testify." Quintanilla's motion ¶ 8(d) (emphasis in original). This request falls outside the scope of *Brady*. The government is not required to provide a defendant with a list of all prospective government witnesses. *United States v. Braxton*, 877 F.2d 556, 560 (7th Cir.1989). It logically follows that the government need not disclose the names of persons who the government will not call to testify. Request 8(d) is denied.

 Finally, the government objects to paragraphs 8(a), (b) and (c), which seek the name and identity of any person who "has denied having knowledge of any criminal activity on the part of Carlos Quintanilla ... [or who] ... has attested to [Quintanilla's] honesty, good character and/or lack of involvement in criminal wrongdoing ... [or] ... who has stated that Carlos Quintanilla did not participate in illegal or improper practices in connection with ... [Operation] Search." In addition, paragraph 4(a)(5) requests disclosure of statements made by government witnesses that Quintanilla "was not involved in any criminal activity, including, but not limited to, the criminal activity charged in the indictment." This evidence is irrelevant, for it tends to demonstrate only that Quintanilla did not commit similar crimes on other occasions. *United States v. Winograd*, 656 F.2d 279, 284 (7th Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982); *McDonnell*, 696 F.Supp. at 364. Accordingly, requests 4(a)(5), and 8(a), (b) and (c) are denied.

The government does not contest request 8(e), which calls for disclosure of any indi-

vidual who possesses exculpatory information. Accordingly, request 8(e) is granted.

### CONCLUSION

Quintanilla's motion to dismiss Count One of the indictment is denied. Gutierrez' motion to dismiss the indictment or, in the alternative, for a *Kastigar* hearing is denied. Quintanilla's request for disclosure of exculpatory evidence is granted in part and denied in part. Requests 2(a) and 8(e) are granted. Request 6 is granted in part and denied in part. All other designated requests are denied.